UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | | |
|---|---|---|---|
| THE ESTATE OF MICHAEL SCHWARTZ, | ) | | |
| and BRENDA FISCHER | ) | | |
| | ) | | |
| Plaintiffs, | ) | Cause No.: | 4:16-CV-00673 JMB |
| vs. | ) | | |
| | ) | | |
| ASSISTED RECOVERY CENTERS OF | ) | | |
| AMERICA, LLC, et al. | ) | | |
| | ) | | |
| Defendants. | ) | | |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO ALL DEFENDANTS' MOTIONS TO DISMISS AND/OR SUMMARY JUDGMENT**

## I.    INTRODUCTION – Summary of the Pleadings and the Issues

On May 13, 2016, Plaintiffs filed their original Complaint.  On October 11, 2016, Plaintiffs filed their First Amended Complaint (Document 63), and the Court entered an Order granting leave to file that Complaint on October 28, 2016 (Document 66).

The First Amended Complaint contains four (4) counts, and is broken down by claims and Defendants as follows:

- Count I – Violation of the Fourteenth Amendment of the United States Constitution (Substantive Due Process/Deliberate Indifference) and 42 U.S.C. §§ 1983 and 1988; brought by both Plaintiffs against all Defendants.

- Count II – Violation of the Fourteenth Amendment of the United States Constitution (Failure to Train and Supervise) and 42 U.S.C. §§ 1983 and 1988; brought by both Plaintiffs against all Defendants.

- Count III – Wrongful Death, Revised Statutes of Missouri § 537.080 et seq.; brought by both Plaintiffs against all Defendants, except Dr. Paul Selvadurai and Dr. Shannon Jennings.

- Count IV – Medical Malpractice, Revised Statutes of Missouri § 538.205 et seq.; brought by both Plaintiffs against Defendants Dr. Paul Selvadurai and Dr. Shannon Jennings.

All Defendants have filed Motions to Dismiss – some relying upon evidence, which could be treated by this Court as a Motion for Summary Judgment under Federal Rule of Civil Procedure 56.

There are four (4) separately filed Motions to Dismiss and/or Motions for Summary Judgment which is before this Court.  These are broken down by Defendants and their counsel as follows:

- (Documents 73 and 74) – Motions to Dismiss Counts I through III filed by Defendants Assisted Recovery Centers of America, LLC ("ARCA"), Tim Dalaviras, Katherine Kruse, Judealyne Menzies, Percy Menzies, Suneal Menzies, Andrea Shaw.  (Legal counsel, Sandberg Phoenix & von Gontard, PC).

- (Documents 75 and 76) – Motion to Dismiss Counts I, II and IV filed by Defendant Paul Selvadurai, MD.  (Legal counsel, Kamykowski, Gavin & Smith, PC).

- (Document 88) – Motion to Dismiss Counts I, II and III filed by Defendant Sheryl Castro.  (Legal counsel, Behr, McCarter & Potter, PC).

- (Documents 91 and 92) – Motion to Dismiss Counts I, II and IV filed by Defendant Shannon Jennings, MD.  (Legal counsel, Sandberg Phoenix & von Gontard, PC).

The substantive arguments raised by each of the Defendants, as the Counts apply to them, are in large part piggy-backed based upon the identical arguments of other Defendants.  Plaintiffs can respond uniformly to those arguments.  However, some nuance appears based upon the Defendants' status – namely the doctors, and Plaintiffs will address those separately.

Problematic though is that some Defendants are citing to and relying upon evidence, which is no longer a Rule 12(b)(6) motion, it is a Rule 56 motion.  Plaintiffs are necessarily forced to put evidence in front of the Court as if they were Rule 56 motions.

## II.    STATEMENT OF FACTS

### A.    Probation Officer Paul Koessel Deposition and Exhibits

Paul Koessel was Michael Schwartz' last probation officer.  (Exhibit 1B, Deposition of Paul Koessel, pp. 4-6, 32, 33).  The Hillsboro office where Paul Koessel is employed was the supervising office of Michael Schwartz for three (3) court ordered circuit court cases from St. Louis City, St. Louis County, and Lincoln County.  (Exhibit 1B, pp. 7-16; Exhibit 2, Orders of Probation with special conditions from each of the three (3) circuit courts).  Among the provisions of special conditions of probation were:

2

"1.   Enter and successfully complete an outpatient substance abuse counseling program."

"3.   Subject is to attend an aftercare program focusing on substance abuse for the duration of probation.  Initial contact with program to occur within fourteen (14) days of release from Missouri Department of Corrections."

"5.   Subject is to submit to random blood/breath/urine testing as directed by any Law Enforcement Official or Probation Officer.  Subject is to submit to at least one such test every 90 days for the first year of release from Missouri Department of Corrections."

"6.   Subject is to attend regular self-help or 12 step meetings for the duration of probation.  Initial contact with program to occur within fourteen (14) days of release from Missouri Department of Corrections."

Defendant ARCA is one of the authorized providers for the Missouri Department of Corrections.  (Exhibit 1B, pp. 17-20; Exhibit 7, List of Authorized Out-Patient Service Providers).

To insure there is a free flow of information between the provider (e.g. ARCA), the probation officer and the probationer regarding the care, there is a 3-party agreement signed by each.  (Exhibit 1B, pp. 21-28; Exhibit 3, Community Treatment and Recovery Service Referral Form).  Page 2 of the agreement in Exhibit 3 is signed by the probation officer, the client, and the service provider.  (Exhibit 3).  Page 2, item 4 of the agreement in Exhibit 3, lists the specific duties of the service provider, which are:

"4.   Inform referring officer within two business days of:
- Missed appointments
- Positive tests for alcohol, illicit, or non-prescribed drugs
- Failure to comply with treatment or recovery plan
- Obstacles to treatment/recovery (transportation, money for medication, unsafe home environment, employment issues)"

Immediately above the signatures on page 2 of Exhibit 3, are the following warnings and instructions to the service provider in bold caption:

"*If an individual refuses to consent to disclosure of clinically appropriate information, or at any time during treatment and recovery revokes such consent, then the client's course of treatment/recovery cannot be verified by the Department of Corrections and will not satisfy conditions of probation or parole.

If the service provider cannot adhere to these guidelines, the supervising officer should be contacted prior to delivering services.

The service provider should return a signed copy of this form to the referring district's office."

Exhibit 4 to the deposition is a collection of letters from ARCA to Michael's probation officers regarding his treatment and progression. (Exhibit 1B, pp. 29-31; Exhibit 4). Exhibit 3 and letters like those in Exhibit 4 are placed into a "working file" in the Hillsboro probation office. (Exhibit 1B, pp. 29-31). When Michael died, the entire "working file" was destroyed. (Exhibit 1B, pp. 31, 32).

Exhibit 5 to the deposition is a collection of Michael's "NOTICE OF CITATIONS" which was generated by the Hillsboro office to each of the three (3) circuit court judges. (Exhibit 1B, pp. 33-37; Exhibit 5). The probation officers have no discretion in forwarding these violation notices to the courts when they become aware of violations, the judges have to know. (Exhibit 1B, pp. 33-37).

Exhibit 6 to the deposition contains the Orders of Probation from the sentencing courts which contains the terms and conditions of probation. (Exhibit 1B, pp. 37-40; Exhibit 6). Both the probation officer and the probationer are required to sign these documents. (Exhibit 1B, p. 38).

Exhibit 8 to the deposition is a HIPPA medical records release authorization that each probationer is required to sign in order to obtain information from the health care provider to the probation officer. (Exhibit 1B, pp. 41-46; Exhibit 8). This Release was also destroyed when Michael died. (Exhibit 1B, p. 40).

Exhibits 9-11 were obtained after the Paul Koessel deposition by Plaintiffs' counsel. These three (3) documents are required to be signed by every probationer who is receiving community based treatment. (Exhibit 1A, Affidavit of Larry A. Bagsby, par. 8). These are identical to Exhibit 3 and Exhibit 8 from the Paul Koessel deposition, the original of which have been destroyed.

**B.      Arca And Its Employees Knew Exactly What Their Obligations Were To Michael's Probation Officer, They Did It In November 2011**

Exhibit 12 is a violation report contained in Exhibit 5 from the deposition of Paul Koessel, Michael's probation officer.  Exhibit 12 is a report dated November 29, 2011.  The probation officer had received notice of violations of probation committed by Michael from ARCA employee, Ned Presnall.  Because of those phone calls from Mr. Presnall, the probation officer sent to the court his request that Michael's probation be revoked and a capias warrant issued.  The following passages appear in that violation report:

> "This officer was notified by Schwartz substance abuse counselor, Ned Presnall, of Assisted Recovery Centers of America that Schwartz had taken at least 10 Xanax and was transported to the hospital for an apparent overdose.  Presnall stated that Schwartz had been discovered by his sister and she advised that he had taken at least 10 Xanax."

> "On 11/22/2010, this officer received a call from Ned Presnall indicating that Schwartz had been taken to the hospital over the weekend for taking at least 45 Lithim in less than a 24 hour period.  The prescribed dose was two 25 Mg Lithim two times a day.  He also stated that Schwartz was not keeping his appointments with his substance abuse counselor."

> "His counselor at Assisted Recovery Centers of America indicates that he does not believe there is any more he can offer Schwartz at this time.  It appears as if Schwartz has exhausted all community based resources available.  This officer believes the only recourse is to revoke Schwartz probation and execute his sentence."

**C.      Dr. Shannon Jennings' Office Address, Hours, and Contact Information**

Dr. Shannon Jennings appears on four (4) very common websites for her office address, her hours of availability, and her contact information.  The four (4) websites are:  www.webmd.com, www.healthgrades.com, www.medicinenet.com, and www.yellowpages.com.  On each, her office address is 6651 Chippewa Street, St. Louis, Missouri 63109 – the address of ARCA.  (Exhibits 13-16).

## III.     STANDARD OF REVIEW

### A.     Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires that a claim for relief must contain a short and plain statement that demonstrates grounds for the court's jurisdiction, showing that the pleader is entitled to relief, and a demand for the relief sought.  The pleading standard does not require detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."  Id.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Although the court must take all of the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678.  "[W]here well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but has not shown that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a sheer possibility."  *Braden v. Wal-Mart Stores*, 588 F.3d 585, 594 (8th Cir. 2009).  "It is not, however, more than a probability requirement."  *Iqbal*, 556 U.S. at 678.  "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556.

6

"In addition, some factual allegations may be so indeterminate that they require further factual enhancement in order to state a claim." *Braden*, 588 F.3d at 594.  The complaint "should be read as a whole, not parsed piece by piece to determine whether each allegation in isolation, is plausible." *Id.*  "Ultimately, evaluation of a complaint upon a motion to dismiss is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

> ### B.    Rule 56

Under Rule 56, summary judgment is not permitted when the facts, taken in the light most favorable to the non-moving party, are in dispute.  The moving party carries the burden of proof.  Summary Judgment can only be entered when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## IV.    ARGUMENT

> ### A.    Counts I and II State Violations of the Fourteenth Amendment

Factually, the pleadings and the deposition of Paul Koessel demonstrates in Exhibits 3 and 8 that ARCA voluntarily agreed to act as an arm and agent of the state.  These Exhibits demonstrate precisely how the probation system is supposed to work.  Most significantly, if private treatment providers do not report failures in the treatment to the probation officer, then no one, absolutely no one, will know.  Exhibit 3 required ARCA to report every failed aspect of his treatment within the guidelines of forty-eight (48) hours.  Exhibit 8, the HIPPA medical release, completely waived the physician/patient privilege.   ARCA was not required otherwise to act as an arm and agent of the state.  They voluntarily chose to.  Thereafter, they did nothing they had agreed to do in the releases.  As a consequence, Michael died of the very deadly addiction that ARCA had agreed to both treat, and, save him from himself by reporting his failures to his probation officer.

In the custodial setting, this is the very scenario that imposed liability on physicians. Physicians who sign contracts with the state and then act deliberately indifferent to that custodial patient are liable under substantive due process claims. *West v. Atkins*, 487 U.S. 42 (1988); *Bass v. Wallenstein, et al*., 769 F.2d 1173 (7th Cir. 1985).

In the non-custodial setting, the Eighth Circuit has for decades recognized substantive due process claims. In *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir. 1990), the court observed:

> "It is not clear, under *DeShaney*, how large a role the state must play in the creation of danger and in the creation of vulnerability before it assumes a corresponding constitutional duty to protect. It is clear, though, that at some point such actions do create such a duty. *DeShaney*, 109 S.Ct. 1005. To date the Supreme Court has found such a situation only in a custodial setting. Id. It is instructive, however, that in *DeShaney* the Court considered it necessary to review the state's actions with regard to Joshua's claim to determine whether the state had placed him in greater danger or made him more vulnerable, even though he was in a non-custodial setting. *Id*. at 1006. This analysis establishes the possibility that a constitutional duty to protect an individual against private violence may exist in a non-custodial setting if the state has taken affirmative action which increases the individual's danger of, or vulnerability to, such violence beyond the level it would have been at absent state action. Appellant's allegations indicate that in this case the state may have increased the dangers faced by the Downen women to such a level." *Id*. at 55.

The Eighth Circuit has very recently set out the elements of this "state created danger" theory of liability. In *Gladden v. Richbourg*, 759 F3d. 960, 965 (8th Cir. 2014), the court set forth the elements:

> "To establish a constitutional violation under a state-created danger theory, a plaintiff must prove (1) that he was a member of a limited, precisely definable group (not in dispute here); (2) that the defendants' conduct put the plaintiff at a significant risk of serious, immediate, and proximate harm; (3) that the risk was obvious or known to the defendants; (4) that the defendants acted recklessly in conscious disregard of the risk; and (5) that, in total, the defendants' conduct shocks the conscience", citing *Avalos v. City of Glenwood*, 382 F.3d 792, 799 (8th Cir.2004).

The facts of *Gladden* are particularly helpful here. In *Gladden*, police officers picked up Mr. Gladden who was walking late at night after a night of drinking in 25-35 degree weather. The officer then transported Mr. Gladden to a remote area where Mr. Gladden requested to be

released.  The next morning, he was found dead from hypothermia, and his blood alcohol content was .34.  In analyzing the legal claim and the defense of qualified immunity, the court found that "the level of intoxication is the dispositive issue in this case." *Id*. at 967.  The court found that the officer was entitled to qualified immunity because objectively, to the officers, the evidence showed that Gladden was not so intoxicated that he was in danger of harming himself.  The court further compared the facts before it to those in *Riordan v. City of Joliet,* 3 F.Supp.2d 889, 891-93 (N.D.Ill. 1998) which denied qualified immunity on very similar facts.  *Gladden* at 966. Focusing on the danger of the individual to himself, the court found very significant the risk of harm, and the liability of the state actor:

> "The extent of Gladdens' intoxication, however, is a potentially complicating factor that must be taken into account. Circumstances that are harmless to a sober person may be dangerous to one who is severely intoxicated or otherwise incompetent. Bitterly cold weather is one such circumstance: while most people can be expected to navigate cold weather to find an indoor shelter, an intoxicated person may lack this capacity. In <u>*Riordan v. City of Joliet,*</u> <u>3 F.Supp.2d 889</u>, 891– 93 (N.D.Ill.1998), for example, police officers evicted a severely intoxicated man from his hotel and left him on the steps of the police station on a cold night with instructions to go inside the station. The man never entered the station, and he was found several hours later in the alcove of a nearby building, suffering from severe hypothermia and frostbite. *Id.* at 893. The court denied qualified immunity to the officers after concluding that the plaintiff's severe intoxication should have alerted the officers to his inability to care for himself on a cold night. *Id.* at 898– 99.

> A person's intoxication may also prevent him from making an informed, rational choice. *Thus, even when an officer provides an individual with several alternatives and the individual elects to pursue the most dangerous option, the officers are not excused from creating a dangerous situation if it was obvious to the officers that the person was in no condition to make such a choice*." *See id.* at 896.  *Gladden* at 966.  (emphasis added)

The claim of Plaintiffs here, and the pleadings explain it quite thoroughly, is that Michael Schwartz was helpless to a deadly addiction to heroin.  ARCA knew that.  ARCA exists because of the nationwide epidemic.  He was on a path that would literally take his life unless intensive therapy was employed by ARCA and its staff, or alternatively, that he was failing his therapy

and probation and parole officers should have been made aware of it within forty-eight (48) hours for violating his special conditions of probation.

Plaintiffs have therefore stated a claim under Rule 12(b)(6), and equally produced what appears to be disputed issues of material fact which would preclude summary judgment under Rule 56.

Plaintiffs would also like to respond to the Defendant Dr. Selvadurai's assertion that, factually, the Complaint does not meticulously address the supervisory role of Dr. Selvadurai over Sheryl Castro.  Having had no opportunity to take the depositions of any of the ARCA employees at this stage, Plaintiffs would respond that this issue is more appropriately addressed in a full-blown summary judgment motion after discovery.   Again, however, on the law, Plaintiffs have stated a claim under Rule 12(b)(6).

In *Wagner v. Jones*, 664 F.3d 259 (8th Cir. 2011), the court held that supervisor liability under § 1983 is imposed "for a violation of a federally protected right when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see." *Id.* at 275.  Further, while "the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may . . . be liable . . . if either his direct action or his failure to properly supervise and train the offending employee caused the constitutional violation at issue." *Jackson v. Nixon,* 747 F.3d 537, 543 (8th Cir. 2014).  "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in creating, applying, or interpreting a policy that gives rise to unconstitutional conditions." *Jackson* at 545.  A defendant's necessary involvement is assessed "relative to his [or her] authority over the claimed constitutional violation." *Id.* at 545.

10

Given the current procedural posture of this case, and the breadth of the law for supervisory liability, the Defendant doctor is very much exposed to liability on that claim.

Finally, the Defendant Dr. Selvadurai makes two (2) additional arguments under Counts I and II that (1) there was no medical release signed by Michael Schwartz, and, (2) the pleadings do not establish causation.

As to the first argument, it is clearly refuted by Exhibits 9 and 10, which were destroyed by his probation officer after Michael died.  As to the second argument – causation, that is a jury issue.  But as a cursory response, it will be interesting to hear in a deposition from Dr. Selvadurai how he never looked at his own patient's file to discover fabricated treatment and counseling records, medical shots that were never given – and given by someone (Castro) who is unauthorized to administer them, and finally, repeated failures of treatment requiring discharge from his treatment under ARCA's own contract.

### B.    Count III States a Claim For Wrongful Death

The ARCA Defendants have raised three (3) issues against Count III.  The first is that the Court should ignore Count III, and instead, re-characterize it as a breach of contract claim.

The dispositive case cited by Defendants which discusses the failure of that proposition is the Missouri Supreme Court decision in *Stiffelman v. Abrams*, 655 S.W.2d 522 (Mo.en banc 1983).  There, the plaintiff filed a two (2) count petition.  Count I was a claim arising from the death at a nursing home under the newly enacted Omnibus Nursing Home Act, RSMo. § 198. Count II was a separate breach of contract claim, and it was labeled a breach of contract claim. The Supreme Court did affirm dismissal of Count II because there cannot be an independent claim for breach of contract, where the substance of the factual claims was a wrongful death. The court held that:

11

"Although Count II is framed in terms of breach of contract, the legal effect is to seek damages for beating decedent so severely that he was badly injured, lingered for a time, and died.  What was done to Mr. Stiffelman would give rise to a cause of action under the Act whether there was any contract or not."  *Id.* at 536.

The mere presence of a contract does not therefore convert a wrongful death claim into a breach of contract claim.  Plaintiffs have no breach of contract claim in their Complaint, and this argument, therefore, fails.

Second, the ARCA Defendants argue that the standard of care that should be applied to Count III is "ordinary care", not the "highest degree of care" as alleged in Count III of the pleadings.  As a preliminary matter, Defendants cite no cases or authority of any type which would allow the Court to dismiss the Count based upon a pleading alleging a standard of care. This is logically so, because there is none.

The standard of care is a question of law for the Court to decide.  *Chavez v. Fair*, 450 S.W.3d 291, 300 (Mo.en banc 2014).  Missouri requires the "highest degree of care" standard for activities that are inherently dangerous.  *Id.* at 300.  Traditionally these have fallen into the categories of activity with electricity, explosives, firearms, commercial carriers and motor vehicles.  By analogy, the patients of ARCA with opiate and heroin addictions are living with a deadly addiction, which ARCA itself acknowledges.  In the absence of intensified patient care, ARCA knows its patients will die.  The facts of this case would then fall into the "inherently dangerous" practice and require the "highest degree of care" standard.

Third and finally, the ARCA Defendants argue that this claim in Count III should be treated as a medical malpractice claim under Chapter 538.  As to Count III, these Defendants argue that the failure to contact the probation and parole officer is somehow a routine, normal healthcare practice which precludes a wrongful death claim under Chapter 537, RSMo.  Missouri courts have heard this argument made before.  There is no such thing as a medical field shield for

all activities of a healthcare provider.  Merely because a defendant is engaged in a profession of medical services does not prohibit negligent, or even intentional, tort litigation against them outside of Chapter 538, RSMo. (medical malpractice).

In making the determination, Missouri courts look to the gravamen of the factual allegations being brought.  *Hilyard v. Medtronic, Inc.*, WL 1846106, (E.D.Mo. 2014).  Logically, this Court and Missouri courts have repeatedly found conduct like failing to report probation violations and/or contacting a mother to warn of dangers are not subject to Chapter 538.  *Spero v. Mason*, 372 S.W.3d. 72 (Mo.App.W.D. 2012).  (failing to warn employee of the dangers of interacting with residents of a violent history not subject to Chapter 538).  *Meekins v. St. John's Regional Health Center, Inc.,* 149 S.W.3d 525 (Mo.App.S.D. 2004).  (reporting false positive drug testing to an employer not to be subject to Chapter 538).  *Hilyard* (using medical devices in an off-label manner not subject to Chapter 538).  *Breeden v. Hueser*, 273 S.W.3d. 1 (Mo.App.W.D. 2008).  (improper billing practices and misrepresentation of medical products sold not to be subject of Chapter 538).

The conduct alleged in this lawsuit in Count III is the failure to perform duties of contacting Probation and Parole about violations, and/or contacting decedent's mother regarding dangerous behavior.  That is not the practice of medicine.

### C.     Count IV States a Claim For Medical Malpractice

Defendant Selvadurai raises four (4) issues against him for medical malpractice.  The first is related to a technical argument of the pleadings, and Defendant cites to a Missouri Supreme Court case regarding pleadings.  This argument carries no weight in that this Defendant is in federal court, where the Federal Rules of Civil Procedure apply – namely Rule 8, which requires notice pleading.

Second, Defendant makes the same argument as the ARCA Defendants regarding wrongful death based upon a contract, and there is no contract claim in this lawsuit. Defendants rely upon the same case of *Stiffelman v. Abrams*, 655 SW.2d 522, 536 (Mo. en banc 1983). Plaintiffs' response is the same. A wrongful death claim exists whether a contract exists or not.

Third, Defendant Selvadurai argues that the failure to terminate a patient from drug rehabilitation is not medical malpractice. In this argument, Defendant makes a causation argument based upon the facts, and asks this Court to believe his theory of the facts, not those pled. Fatally, the entire argument is fact based, and the Motion before this Court is filed under Rule 12(b)(6). Under the applicable standards of that motion, Plaintiffs have stated a claim for medical malpractice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Fourth, Defendant Selvadurai makes the strange argument that a statutory cap applies to Count IV, and that somehow extrapolates into a legal basis for dismissal of Count IV. No authority at all is cited for that proposition.

On the substance of that argument, however, Defendant is wrong in arguing that a statutory cap of $350,000.00 applies to this Count. The current version of § 538.210.1(3) states:

> "(3) In any action against a health care provider for damages for death arising out of the rendering of or the failure to render health care services, no plaintiff shall recover more than seven hundred thousand dollars for noneconomic damages irrespective of the number of defendants."

There is nothing in the current language of this section that limits recovery based upon the date the cause of action "*accrued*", as Defendant asserts. The decision cited by Defendant in *Dodson v. Ferrara*, dealt with the unique facts before the court, as the court itself recognized to be the likely last case under the statutory cap that existed. In any event, whatever cap may apply in the future, if any, it does not support dismissal of the claim.

### D.    Defendant Shannon Jennings, MD Received Proper Service of Summons

The final issue before this Court on all Motions is one unique to Defendant Shannon Jennings, MD, who alleges she was not properly served with the summons.  Fatal to her argument is that she presents *no evidence* before this Court that service was not proper at her place of employment – where she practices medicine.

The law of service is well established.  The service of a summons and petition gives notice of a claim and an opportunity to respond.  *Hometown Lumber & Hardware, Inc. v. Koelling*, 816 S.W.2d 914, 916 (Mo. banc 1991) ("[T]he underlying principle of a summons is to place a defendant on notice of an action filed against the defendant to enable the defendant to appear and defend against the action.")  *LNV Corp. v. Robb*, 843 F.Supp. 2d 1002, 1005 (W.D. Mo. 2012) ("Due process only requires notice reasonably calculated to apprise the defendant of the pendency of the action and afford him an opportunity present his objections.").  Under Defendant Jennings' own cited authority, *Cook v. Polineni, MD*, 967 S.W.2d 687, 690 (Mo.App.E.D. 1998), the law is clear:  "A return of service is prima facie evidence of service. Rule 54.22(a).  To impeach a return of service there must be clear and convincing evidence corroborating the denial of the party alleged to have been served."  Here, there is no evidence. None.

In *Cook*, the defendant was able to vacate a default judgment against him by presenting evidence that his office where he practiced medicine was one where no one was authorized to accept documents on his behalf.  This was established through testimony of the receptionist and the physician himself.  Here, there is no evidence supporting such lack of authority, and what evidence is before the Court from Plaintiffs, is that the ARCA address is her office address. (Exhibit 13-16).  Because Defendant Jennings has neither presented any evidence contradicting

the authority of the service that has been obtained, nor refuted Plaintiffs' evidence, service has been proper.

## V.    CONCLUSION

For the foregoing reasons, all Defendants' Motions to Dismiss must be denied as Plaintiffs have stated claims that are plausible under Rule 12(b)(6), and alternatively, presented genuine issues of material fact which preclude the entry of summary judgment.

Respectfully submitted,
THE BAGSBY LAW FIRM                    LAW OFFICE OF KARIE PENNNINGTON, LLC


/s/    Larry A. Bagsby                  /s/    Karie M. Pennington
Larry A. Bagsby, #37296                Karie M. Pennington, #65692
125 North Main Street, Suite 204       3115 South Grand Blvd., Suite 350D
St. Charles, MO  63301                 St. Louis, MO  63118
(636) 244-5595 telephone               (314) 681-9000 telephone
(636) 244-5596 facsimile               Karie@lawyerup314.com
larrybagsby@aol.com
*Counsel for Plaintiffs*                *Co-Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

A copy of the foregoing was electronically filed and served this 2nd day of December, 2016, to:

Jonathan Ries
Mohsen P.K. Pasha
Sandberg Phoenix & von Gontard, PC
600 Washington Avenue – 15th Floor
St. Louis, MO 63101-1313
*Counsel for Defendants Assisted Recovery Centers of America, LLC, Percy Menzies, Judealyne Menzies, Suneal Menzies, Tim Dalaviras, PhD, Andrea Shaw and Katherine Kruse*

Mandy J. Kamykowski
Michael C. Schroeder
Kamykowski, Gavin & Smith, PC
287 N. Lindbergh Blvd.
St. Louis, MO  63141
*Counsel for Defendant Paul N. Selvadurai, MD*

Richard J. Behr
John P. Torbitzky
Behr, McCarter & Potter, PC
7777 Bonhomme Avenue, Suite 1400
St. Louis, MO  63105
*Counsel for Defendant Sheryl Castro*

/s/    Larry A. Bagsby