IN THE CIRCUIT COURT OF JEFFERSON COUNTY, MISSOURI
PROBATE DIVISION



In Re the Matter Of:               )
                                   )
ESTATE OF MICHAEL PATRICK          ) Case No. 15JE-PR00407
SCHWARTZ,                          )
                                   )
            Deceased.              )


Deposition of PAUL KOESSEL
On behalf of The Estate of Michael Schwartz

Taken December 21, 2015



**Reported by Elizabeth K. Immekus, CCR #484**
**for**
**HULL REPORTING**
**834 Madison Street**
**Saint Charles, Missouri 63301**
**(636) 946-1354**

**1**

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, MISSOURI
PROBATE DIVISION

In Re the Matter Of:                )
                                    )
ESTATE OF MICHAEL PATRICK    ) Case No. 15JE-PR00407
SCHWARTZ,                           )
                                    )
          Deceased.          )

Deposition of PAUL KOESSEL
On behalf of The Estate of Michael Schwartz

Taken December 21, 2015

Reported by Elizabeth K. Immekus, CCR #484
for
HULL REPORTING
834 Madison Street
Saint Charles, Missouri 63301
(636) 946-1354

---

**2**

APPEARANCES

For The Estate of Michael Schwartz:

3    THE BAGSBY LAW FIRM
4    125 N. Main Street, Suite 204
     St. Charles, MO 63301
5    By: Mr. Larry A. Bagsby

6    and

     LAW OFFICE OF KARIE PENNINGTON, LLC
7    P.O. Box 2095
     Imperial, MO 63052
8    By: Ms. Karie Pennington

9    Also present:

10   Mr. Michael Schwartz

11   Ms. Sheila Dickson
     Office of Probation and Parole
12   Hillsboro, MO 63050

---

**3**

1              PAUL KOESSEL,

2    being produced, duly sworn, and examined on behalf of The

3    Estate of Michael Schwartz, testifies as follows:

4                 DIRECT EXAMINATION

5    BY MR. BAGSBY:

6       Q.   Sir, would you state your full name, please?

7       A.   My first name is Paul, P-A-U-L, Koessel,

8    K-O-E-S-S-E-L.

9       Q.   And what is your employment?

10      A.   I work with the Missouri Board of Probation and

11   Parole.

12      Q.   All right. Could you run me through your

13   educational background.

14      A.   I have a Bachelor of Science in psychology from

15   Southeast Missouri State University.

16      Q.   What year was that?

17      A.   1991.

18      Q.   Okay. How long have you been employed here with

19   the Missouri --

20      A.   Since 1994.

21      Q.   Okay. Has it always been here in Hillsboro?

22      A.   No.

23      Q.   Can you run me through the history of where you

24   started?

25      A.   Briefly, I started in St. Louis in 1994,

---

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, MISSOURI
PROBATE DIVISION

In Re the Matter Of:          )
                              )
ESTATE OF MICHAEL PATRICK ) Case No. 15JE-PR00407
SCHWARTZ,                     )
                              )
     Deceased.        )

Deposition of PAUL KOESSEL, produced, sworn, and
examined on behalf of The Estate of Michael Schwartz, on
the 21st day of December, A.D., 2016, between the hours of
eight o'clock in the forenoon and six o'clock in the
afternoon, at the offices of the Missouri Board of
Probation and Parole, 4621 Yaeger Road, in the City of
Hillsboro, State of Missouri, before Elizabeth K. Immekus,
Certified Court Reporter within and for the State of
Missouri, in a certain cause now pending in the Circuit
Court of the County of Jefferson, State of Missouri, In Re
the Matter Of: ESTATE OF MICHAEL PATRICK SCHWARTZ.

**2**

1 Q. Okay. Could you generally just describe for me
2 what you do here at Missouri Board of Probation and
3 Parole?
4 A. I'm a primary supervision officer. I supervise
5 anywhere from sixty to a hundred clients that are either
6 adjudicated by the courts or released from the parole
7 board to parole and do community supervision.
8 Q. Okay. Now, you've been served with a subpoena in
9 this case, correct?
10 A. That's correct.
11 Q. And you're appearing here today pursuant to that
12 subpoena.
13 A. That's correct.
14 Q. Now, the individual that I want to you ask some
15 questions about, his name is Michael P. Schwartz. Do you
16 remember Michael?
17 A. Vaguely, yes. I do remember.
18 Q. I'm going to hand you what I've marked as Exhibit
19 No 1. It's a photograph. Does the photograph at all jog
20 your memory?
21 A. That bears his resemblance. Yes.
22 Q. Okay. I guess before we start, anything unusual
23 experiences that you had with Michael during your
24 supervision?
25

5

1 A. I couldn't comment even if there was.
2 Q. Okay.
3 A. I can't comment anything specific to that client
4 or his case.
5 Q. And I guess maybe we need to simply explain what
6 limitations there are, because Sheila was talking to me
7 about this before we started. Can you tell me just what
8 are the topics you cannot discuss with me?
9 A. Basically anything specifically related to Mike's
10 case.
11 Q. Okay.
12 A. I can talk only in hypotheticals and the other
13 things that would be general terms of his probation,
14 things that would be public knowledge otherwise.
15 Q. Right. And I mailed to you prior to the
16 deposition some records related to Michael. One would
17 have been his probation order with the special conditions.
18 You're allowed to discuss that, I assume, because that's
19 part of the court file.
20 A. Only in general terms. Nothing specific to him.
21 Q. Okay.
22 A. Anything that's on that document I could speak
23 to, but outside of that, no, as it applied directly to him
24 or his compliance with it I couldn't talk about.
25 Q. Okay. Now, both you and Sheila -- And we should

6

1 have this reflected, Sheila is sitting to your right
2 during the deposition, right?
3 A. That's right.
4 Q. We just think that's a smarter idea to speed
5 everything up.
6 A. Okay.
7 Q. Both you and Sheila have been consulted by the
8 attorney general's office as to what your limitations are
9 in this deposition.
10 A. That is correct.
11 Q. So I guess if I walk on something that I don't
12 know what you've been told, that you can't tell me, tell
13 me, okay?
14 A. Sure.
15 Q. That way I just will have a clear understanding
16 in this record.
17 A. Absolutely.
18 Q. All right. We've covered Exhibit 1. I'm going
19 to hand you what we've marked as Exhibit 2. This is from
20 the court file. Are you generally familiar with the type
21 of document that is contained in Exhibit 2?
22 A. Yes.
23 Q. Okay.
24 A. This is basically just a release order on the
25 probation from the institution.

7

1 Q. Okay. And the cover page, the cover page is
2 directing Michael Schwartz to report to a specific
3 probation office immediately, correct?
4 A. Yes.
5 Q. And then attached to that is a copy of the
6 special conditions -- terms and conditions of the
7 probation, correct?
8 A. From Lincoln County. Correct.
9 Q. Okay. Now, that's a fairly typical order that's
10 issued by a court in a criminal case, isn't it?
11 A. Yes. It would be. These are fairly common.
12 Yes.
13 Q. All right. Now, once they report to the local
14 office, can you tell me the procedure as far as
15 registering the probationer?
16 A. Well, generally we introduce ourself first. Is
17 that what you're asking, what we do?
18 Q. Yeah.
19 A. Generally we'll introduce ourselves to them
20 first, we'll lay out basic expectations of probation and
21 parole, generally make them sit through a -- we'll have
22 them sit through an orientation class, we call it
23 intake -- we call it intake, it usually occurs once --
24 every first Wednesday every month. We have the first
25 Wednesday of every month, because each office has slightly

8

1  specific details over others to give them travel
2  restrictions, things of that nature.
3      Q.  Okay.
4      A.  So we explain in great detail what their
   expectations are when they're on supervision.
6      Q.  In this particular case, if you could go to the
7  second page of Exhibit No. 2, there were special
8  conditions. This is the page I'm referring to.
9      A.  Okay.
10     Q.  There you go.
11     A.  Okay.
12     Q.  Now, this is the Court's Order of Probation
13 pursuant to 217.362, right?
14     A.  That's correct.
15     Q.  Okay. Before we get into the specifics of this,
16 I just want to clarify the distinction between a
17 probationer and a parolee. If someone has been to the
18 Department of Corrections, which in this case is reflected
19 on the cover sheet of Exhibit No. 2, because it's a
20 discharge --
21     A.  Mm-hm.
22     Q.  -- from the Department of Corrections, if there's
23 a violation of the terms and conditions of the Probation
24 and Parole Order, the Court's order, would that person be
25 designated a probation violation or would he be a parolee

9

1  Q.  Okay. Now, if he were to violate the specific
2  terms and conditions that are laid out in the order, this
3  order that's dated May 20th, 2014, as received in your
4  office, that violation would then go to the Court,
5  correct?
6      A.  That is correct.
7      Q.  Okay. Now, referring to number one, it says
8  enter and successfully complete an outpatient substance
9  abuse counseling program. Can you explain to me how does
10 a probationer get set up to go into it? Does he get to
11 choose which program he goes into? How does it work?
12     A.  Individuals -- It definitely varies from
13 individual to individual. We take a point of view in the
14 Department of Corrections now where we utilize what's
15 called motivational interviewing. The motivational
16 interviewing tends to let the -- Try to give it to you in
17 thirty words or less. The motivational interviewing tends
18 to let the offender help have input and generate part of
19 the supervision plan rather than the probation officer
20 merely just dictating to them you will do A, B, C, and D,
21 or else. So we give them opportunity for feedback. And
22 sometimes if they want to try a specific treatment plan or
23 treatment provider, as long as the treatment provider is
24 legit we'll be glad to let them try that. So they don't
25 have to go -- in other words, they don't have to go to

11

1  violation where the violation would be go to Board of
2  Probation and Parole?
3      A.  Someone coming out of the long-term treatment
4  program 217.362 would still be under probation.
5      Q.  Okay.
6      A.  Most likely, unless they had like an ancillary
7  case that was a parole case --
8      Q.  Okay.
9      A.  -- attached to it or riding adjacent to it. Make
10 sense?
11     Q.  Yes. So it would be a judge who would be
12 determining whether or not to revoke someone's probation.
13     A.  That would be correct.
14     Q.  Not the Probation and Parole --
15     A.  No.
16     Q.  -- in the way a parolee would be violating.
17     A.  Even then it's not the Board of Probation and
18 Parole that does that, it's the parole board specifically
19 that makes the end decision --
20     Q.  Okay.
21     A.  -- on parole cases.
22     Q.  Got you. Now, in this particular case it's an
   order from the Court so, again, he's going to be a
24 probation violation case, correct?
25     A.  Yes. He was on probation.

10

1  whatever treatment we dictate them to go to.
2      Q.  Okay.
3      A.  They have some latitude and choice, I guess is
4  what I'm trying to say.
5      Q.  But they are required to select some program
6  under the order itself, aren't they.
7      A.  That would be correct. Yes. Yeah. They have to
8  go to something. They have to do something. They can't
9  just -- Or would have to be deemed by a treatment
10 professional to not need treatment.
11     Q.  Okay.
12     A.  Then we would submit that to the Court for
13 further review.
14     Q.  All right. Do they have a timeframe that they're
15 supposed to do it within?
16     A.  Sometimes -- It's flexible. There's usually not
17 a hard concrete timeframe, there's a little bit of
18 flexibility in there, but if it drags on too long we'll
19 definitely bring them to task because they would be -- a
20 lot of times it's because they're still using or maybe
21 it's because they're still -- financial, transportation
22 issues, could be a host of different issues.
23     Q.  Okay.
24     A.  We have a lot of people who live way out in the
25 middle of rural areas.

12

1      Q.  Okay.
2      A.  So sometimes transportation's an issue, would be
3  things of that nature.
4      Q.  But just to take that issue out to the outer
5  limits, I mean, I would assume you're not going to let
6  them stall three, four months to complete it when the
7  court order says --
8      A.  Again, it would depend --  It's case by case,
9  sir. It's impossible to say within a hundred twenty days,
10  within ninety days. Usually there is a goal set and we
11  try to adhere to that in order to give the offender or
12  client some sort of measure, so we can have some sort of
13  measure for that individual.
14      Q.  Okay.
15      A.  It wouldn't be indefinite. It's hard to explain.
16  It wouldn't be indefinite, but there would definitely be
17  some parameters set.
18      Q.  Okay. What happens if they don't complete the
19  program? I mean, this is condition number one. And I'm
20  assuming it's number one for a reason, the Court finds it
21  important. So if they did not complete that program what
22  would happen to them?
23      A.  Well, I wouldn't necessarily assign the special
24  conditions as having one being more important than any
25  other just because of their chronological order here. I

13

1  don't know that the Court assigned that -- I couldn't even
2  speculate what's in the Court's mind what they feel is the
3  most important.
4      Q.  Right.
5      A.  So that wouldn't necessarily make it the number
6  one priority. But I will say this, in answer to your
7  question, which was --  Give me your question again. I'm
8  sorry.
9      Q.  Sure. What would happen if he did not complete
10  number one, though?
11      A.  Generally, it could be anything -- again, it's
12  individual based. There's so many different circumstances
13  and reasons. There could be --  I work with all different
14  kinds of people. Again, it could be an instance of
15  transportation; it could be an instance of willingness; it
16  could be an instance of continued relapse; it could be an
17  instance of money, it could be that they don't have any
18  money to get transportation or get a ride there. It
19      Q.  Right.
20      A.  Depending on what that circumstance is will
21  dictate my reaction to it. So it could be merely just a
22  re-referral to a different treatment program. It could be
23  merely a counseling or it could be a full-on violation me
24  asking for a warrant. It could be any one of those
25  sanctions.

14

1      Q.  Okay. And you've given me a very broad spectrum
2  of options of that could cause what your reaction's going
3  to be. Let's assume -- I want you to assume just for the
4  sake of the question, that the probationer is unwilling to
5  do it. He's not going to cooperate.
6      A.  If he was unwilling to do it and just being
7  recalcitrant, continuing to use, it may take a more
8  forceful sanction at that point in time. It would be
9  graduated and progressive. You'd just keep trying to set
10  him up for the next level that would, quote, make sense.
11  It could be a warrant. It could be, you know, requesting
12  a warrant for the judge. But, again, that's always up to
13  the judge whether they actually want to impose the
14  sanctions or not.
15      Q.  Right.
16      A.  I just merely make the recommendation for it.
17      Q.  Right.
18      A.  But along the way I'm going to be utilizing what
19  I touched on earlier, the motivational interviewing to try
20  to get them to see the value in going to treatment, how
21  it's going to benefit them the most.
22      Q.  Okay. But clearly wouldn't one of the options be
23  to generate a violation report and then it's up to the
24  judge to decide whether -- and the prosecutor, actually,
25  to decide --

15

1      A.  And, again, sir, when we're talking about
2  generalities here, each case and each stage of the -- of
3  the violation process is so widespread depending on the
4  individual. It is case by case by case.
5      Q.  Okay.
6      A.  So I could not sit here and give you a definitive
7  answer each and every time I write a violation report,
8  because I may not. Sometimes I may just make a note of it
9  in my file, give them counseling, and readjust the plan
10  accordingly. If it goes too far, like I said,
11  sometimes -- like I said, there is no concrete like if it
12  goes forty days, thirty days, thirty-seven days, we're
13  going to continue to just keep working with that
14  individual and set them logical and progressive
15  consequences.
16      Q.  Are you required to notify the Court?
17      A.  At a minimum they would get notified through the
18  case summary.
19      Q.  Okay.
20      A.  This would all be encompassed in case summaries.
21  Every six months we generate a case summary or if there's
22  other special circumstances that requires like a transfer.
23      Q.  All right. Now, once the individual has selected
24  a specific program that he or she wants to go, like in
25  this case just dealing with item number one, what happens

16

after that?

1  A.  Well, we would set them up with that treatment
2  program, we'd get the referal. And if it's self-initiated
3  we would let them bring us the information, we would check
4  it out, make sure they are a legitimate treatment center.
5  So it wouldn't be -- If they're not licensed or approved
6  by the State of Missouri, generally that's not going to be
7  accepted. In fact, in every case that's not going to be
8  accepted. We have to use licensed providers.
9  Q.  Okay. Now, out in your waiting room I couldn't
10  help but see that this was -- I'm going to hand you what
11  I've marked as Exhibit No. 7. This is a provider list, I
12  take it, that's contained your office?
13  A.  Right.
14  Q.  Okay. And those are all accepted providers of
15  outpatient treatment facilities?
16  A.  I'm not going to comment to that, only because I
17  am not intimately familiar with each and every one of
18  these.
19  Q.  Okay. Do you recognize it as coming from your
20  waiting room out in front?
21  A.  Honestly, no.
22  Q.  All right.
23  A.  We have resource officers that generates these.
24  Now, if someone were to come ask me about this, I want to

17

1  MS. DICKSON: Mental health. I don't know if I
2  should comment on anything yet.
3  MR. BAGSBY: I don't have a problem with this
4  because --
5  MS. DICKSON: Do you want to go ahead and have me
6  do the other part, too, or do you want me to just not say
7  anything?
8  MR. BAGSBY: I don't have a problem if you want
9  to speak up, really, because, I mean, this is not an
10  adversarial setting.
11  MS. DICKSON: Because it's Department of Mental
12  Health that has that through them now --
13  A.  Oh, I'm sorry.
14  MS. DICKSON: -- it's not really Department of
15  Corrections. That's okay. It just changed recently.
16  MR. BAGSBY: Okay.
17  MS. DICKSON: So we don't necessarily -- it's not
18  Department of Corrections that has the contract with
19  Comtrea, it's Department of the Mental Health. But it is
20  for our offenders. And because most of them do not have
21  insurance or can't afford it, they can go there relatively
22  free or on a sliding scale pretty reasonable.
23  MR. BAGSBY: Okay. Do either one of you know if
24  ARCA has a Department of Mental Health contract?

19

1  go to this one here --
2  Q.  Mm-hm.
3  A.  -- I would check it out just to make sure, I
4  would confirm that it was actually a legitimate provider
5  before I okayed that individual to go there.
6  Q.  Okay. On the document itself, though, do you see
7  where it lists Assisted Recovery Centers of America as one
8  of the providers?
9  A.  Yes. I do. It's printed right here.
10  Q.  Okay. And are you familiar with that institution
11  itself?
12  A.  Barely. We don't -- They're up on Delmar
13  Boulevard in St. Louis. Most of our offenders we
14  utilize -- the majority of my offenders, anyway, that I
15  utilize here is with Comtrea. Because we have a contract
16  with them. So a lot of my offenders come to me, they have
17  no insurance, transportation can be an issue with them
18  sometimes, and we work generally a lot with Comtrea.
19  That's the one provider I work with the most.
20  Q.  Okay.
21  A.  I've worked with others, many others, but that's
22  the one I've worked with the most.
23  Q.  Can you explain to me what you meant when you
24  said we have a contract? Who's the we?
25  A.  The Department of Corrections. I'm sorry.

18

1  (Brief discussion is held off the record
2  regarding sworn testimony versus colloquy in transcript.)
3  MS. DICKSON: As far as ARCA being --
4  MR. BAGSBY: Yes.
5  MS. DICKSON: I do not know. Since that's a
6  St. Louis one it's not one that we utilize, it's -- DMH is
7  one of the ones in our area. I do not know. St. Louis
8  may know that in that area. They're not even in our
9  region.
10  MR. BAGSBY: Okay.
11  MS. DICKSON: And we're the southeast region.
12  MR. BAGSBY: Okay.
13  MS. DICKSON: So R1 is Comtrea for our area.
14  MR. BAGSBY: Is that your understanding why you
15  have the contract with Comtrea is because it's regionally
16  in your area?
17  MS. DICKSON: Like there's other ones that have a
18  DMH contract, but like somebody in Cape may have a
19  different treatment center that's part of that DMH, but
20  that's in their area.
21  MR. BAGSBY: Okay.
22  MS. DICKSON: So Comtrea is kind of in our area,
23  it's in Festus, Arnold, High Ridge. So it's in our area.
24  MR. BAGSBY: Okay. And I may be asking you to
25  speculate, but would you reasonably believe that ARCA

20

1   would have a contract with the St. Louis area?

2       MS. DICKSON: I have no idea.

3       Q. (By Mr. Bagsby) Paul, do you know?

4       A. I have no idea.

5       Q. Okay. I'm going to hand you what I've marked as

6   Exhibit 3. Can you tell me if you're familiar with that?

7       A. Yes. This is a Missouri Department of

8   Corrections Department of Mental Health Community

9   Treatment Recovery Services referral form.

10      Q. And you've seen that before, I take it?

11      A. I have.

12      Q. Okay. If you go to page two of the document, it

13  looks like there's a three-party contract that everybody

14  has to sign off on. Tell me if I'm getting this wrong,

15  the far left column seems to be the supervising officer,

16  which would be a probation and parole officer. Is that

17  right?

18      A. Generally, yes.

19      Q. Okay. And then in the center is the client

20  themself?

21      A. Correct.

22      Q. And then on the far right is who?

23      A. The service provider.

24      Q. Okay. So I'm assuming we were just talking a

25  second ago dealing with the issues of Comtrea. Are you

                        21

1   familiar with this in the context of the contracts you

2   would have with Comtrea?

3       A. Yes. I am.

4       Q. Okay. In this particular case Michael went to an

5   outpatient with ARCA. Can you tell me procedure and

6   policy-wise if he would have to sign a contract like that?

7       A. I can't speak to anything that's directly related

8   to Michael's case.

9       Q. Well, let's just not use his name. Let's assume

10  anybody who goes to a treatment facility in St. Louis,

11  would they be required to have a contract like that?

12      A. Again, I couldn't speak to that because I'm not

13  sure about St. Louis's referral process.

14      Q. Okay.

15      A. It sometimes varies. Like Sheila just stated, it

16  varies region to region. I know that we utilize very

17  similar documents to Comtrea. I fill these out

18  frequently.

19      Q. Okay. Let me see if I can just summarize the

20  purpose of the document and how it works. For instance,

21  if you've got specific conditions of probation that

22  require treatment, this document Exhibit No. 3 exists so

23  that everybody's on the same page that the provider can

24  report to the probation officer if that person is not

25  complying with --

                        22

1       A. No. This is merely the referral form.

2       Q. Okay.

3       A. This is merely the referral form that allows the

4   individual to obtain services via the Department of Mental

5   Health.

6       Q. Okay.

7       A. The release of information would be the document

8   you're talking about that allows us to exchange

9   information between parties.

10      Q. That's exactly what I'm talking about. So if

11  you'll look at the second page where all three parties are

12  required to sign that page, it allows a free flow of

13  information, doesn't it?

14      A. No. No. This is not the release of information.

15      Q. Is there a specific separate form?

16      A. I use a different form than this. Yes.

17      Q. Is it one specific to this office?

18      A. I don't know if it's specific to this office,

19  but --

20      MS. DICKSON: It's a standard -- I mean, there's

21  different ones, but we typically use one. Even in our K

22  drive to our computer system they have a form to the

23  release of information for treatment. Typically most

24  people would probably use something like that.

25      MR. BAGSBY: Okay.

                        23

1       MS. DICKSON: I think what he's trying to say is

2   there's a referral we all agree on and then there's a

3   release of information form, and that form is the one that

4   allows us to interchange information. And not all

5   information, you know.

6       A. Right. And this particular form kind of just

7   outlines roles and responsibilities.

8       Q. (By Mr. Bagsby) Okay.

9       A. It does not allow for the -- I don't want to say

10  circumvent HIPAA, but to alleviate the HIPAA rules in

11  order -- Because without the release of information, I

12  would not be able -- they wouldn't tell me anything.

13  They're required not to say anything at all that that

14  client ever existed or ever sought services, even if they

15  know exactly who sent them there.

16      Q. Right. And that's kind of where I'm going with

17  this. There's got to be some common sense procedure to

18  all this. For instance, I want to go back to Exhibit 3

19  for a minute.

20      A. Okay.

21      Q. If you look at item number four in the left

22  column where it says whose responsibilities are to inform

23  a probation officer about missed appointments, not

24  completing programs, things of that sort, right?

25      A. Yes.

                        24

1    Q.   And they have to do it -- And I'm assuming
2  that's a responsibility of the provider, isn't it?
3    A.   Yeah.  Because this falls under the column of
4  responsibilities of treatment and recovery professional.
5    Q.   So if the provider at the treatment facility is
6  aware that somebody is missing their appointments or not
7  completing programs and things of that sort, they are
8  required within two days to tell the probation officer,
9  aren't they?
10   A.   According to this, yes.
11   Q.   All right.  Is that, in reality, how it works?
12 It seems like there would be to be some kind function like
13 that, otherwise you can't know if they're not completing
14 the program.
15   A.   I can tell you this.  I get regular -- I'll use
16 Comtrea as an example again, that's the one I'm most
17 familiar with.
18   Q.   Okay.
19   A.   And other treatment programs are fairly good.  We
20 use Bill Max up with Assessment Counseling Solutions, as
21 well, in the Fenton area.  What I can tell you about them
22 is generally -- generally speaking -- not to be specific
23 to any one case but generally speaking, they're very good
24 about updating us with regular client case summary
25 reports.  Sometimes, though, they come in, I would say,

25

1  every couple weeks, sometimes once a month, they will
2  always detail what's going on.  I get phone calls everyday
3  from treatment counselors telling me people have missed
4  appointments --
5    Q.   Okay.
6    A.   -- or that they're doing well sometimes, too,
7  they just want me to know they're doing well.  Or that
8  they had a positive urinalysis, etc., or if there's any
9  other major concerns going on.  Individuals exhibiting
10 threats towards somebody, they would let me know right
11 away, usually.
12   Q.   All right.  And is that -- All those contacts
13 that you do receive from the providers you're referring
14 to, is that a requirement that the provider has signed off
15 on in some document somewhere?
16   A.   To be honest with you, I don't know.
17   Q.   For example, again, the second page of number
18 three, and the document makes total sense to me because --
19   A.   Right.
20   Q.   -- it makes everybody operate under very common
21 sense practice that there is no attorney-client privilege,
22 if the provider is not -- or if the probationer is not
23 doing what he's supposed to be doing the provider is
24 supposed to tell you they're not doing that.
25   A.   That's correct.  Yes.  They're not supposed to,

26

1    Q.   quote, keep secrets from us.
2    Q.   Correct.  And the way it works in reality is that
3  the provider does call you up and tell you that they're
4  not doing --
5    A.   I get it via phone call, email, and faxed
6  documents, you might call them case summary reports or
7  treatment updates.
8    Q.   Okay.
9    A.   I get them regularly.  Yes.
10       MR. BAGSBY:  Sheila, would you agree with that,
11 that's how it works?
12       MS. DICKSON:  I think on this particular form,
13 though, since this is the one we utilize with Comtrea, we
14 try to stick to that.  Now, I can't say another substance
15 abuse program would agree and have all this signed on
16 here.  What I can tell you can happen sometimes if there's
17 a release of information if they revoke that, the client,
18 they cannot tell us anything.
19       MR. BAGSBY:  Right.
20       MS. DICKSON:  We've had that happen.  Not very
21 often do clients do that, but they will.
22       MR. BAGSBY:  Okay.
23       MS. DICKSON:  And then we'll address that with
24 the client, because we have to know this information.
25       MR. BAGSBY:  So just to tie all this together,

27

1  because someone is ordered to complete an outpatient
2  facility under the terms and conditions of their
3  probation, wouldn't they have to execute a document like
4  page two of Exhibit 3?
5        MS. DICKSON:  I know that Comtrea works with us.
6  We have kind of come to this agreement we meet with them
7  twice a year with Comtrea and try to have this good
8  working relationship because they're in our area, they are
9  our contracted one.
10       MR. BAGSBY:  Okay.
11       MS. DICKSON:  I can't say that every other
12 facility uses this particular form.
13       MR. BAGSBY:  Okay.  Well, in either of your
14 experiences are you aware of any other instance where
15 there could truly be a provider who's providing services
16 to the Department of Mental Health or Department of
17 Corrections or providing these probation programs and
18 there never is a release?  Otherwise, I don't understand
19 how you guys would ever know --
20       MS. DICKSON:  Oh, I would think there would have
21 to be a release for them to be able to tell us anything.
22 The client should have to sign something.
23       MR. BAGSBY:  I got you.
24       MS. DICKSON:  If they don't they cannot tell us
25 anything, even if they wanted to.

28

MR. BAGSBY: Right. Makes total sense. Okay.

Q. I had mailed to you what I've marked as Exhibit 4. It's a collection of information from ARCA. Do you ever recall seeing documents like that about the completion of certain programs?

A. I can't comment to -- These are all -- these all bear Michael Schwartz's name with personal information on it.

Q. Okay.

A. So I can't speak to whether or not I've ever seen these nor do I recall seeing these.

Q. That's understandable. In general practice, though, I'm assuming you do get documents similar to what are Exhibit 4 from providers.

A. Yes.

Q. Okay. Here at your local office what happens to these documents once you get them?

A. Okay. So these would go into the file material, into our hard copy file. We would also maybe -- the officer may make notes of it, as well, to refer back to later when he writes his case summary report to notify the Court whether or not this individual's been in compliance and how we know he's been in compliance with his conditions of probation -- or non-compliance, as it were.

Q. Okay. And when I started sending subpoenas out

29

to various offices of department of probation and parole when I started all this --

A. Mm-hm.

Q. -- I mean, I think I started with you in like June --

A. Yes.

Q. -- and everybody's telling me where I need to be filing these subpoenas, and I think I hit every office. So I'm trying to figure out where exhibits like four -- who's supposed to end up with those types of documents?

A. These would have gone into the probation and parole file here at district fifteen, what we call the working file.

Q. Okay.

A. They would have gone into my -- well, not my working file, the Court's working file or the district's working file. When Mike expired, that would have gone to our clerical for closing.

Q. Okay.

A. Anything that would have been sent to the Court, case summary reports, notice of citations, violation reports, any official document that would have gone to the Court's file would have been sent to the originating district, which in this case would be --

MS. DICKSON: He had two. He had Lincoln County

30

and St. Louis County, I believe.

MR. BAGSBY: St. Louis City, too.

MS. DICKSON: Don't quote me, I would have to look at the --

A. Right. I would have to look at the orders, as well. But they would go to those originating districts. So they would not receive the working file, they would have what you might call a dummy file or a duplicated file --

Q. (By Mr. Bagsby) Okay.

A. -- which would just be, like I said, all -- and a district officer would collect those documents and file them into his particular file.

Q. Okay.

A. All the working things, like the monthly supervision report forms, if we received any letters or treatment documents, they would also go in that file, as well, along with anything else we collect along the way, check stubs -- copies of check stubs, copies of driver's license, whatever the case might be, would all go into that working file.

Q. Okay.

A. And in this case the working file was destroyed because Michael had expired. So anything that was in that file is gone.

31

Q. Okay. Let's jump back to Exhibit 3 then. When we were talking about these releases that people sign, are those in the working file?

A. They should be.

Q. So if that was in the working file --

A. It would be destroyed.

Q. -- it's destroyed now. Okay. That makes a lot of sense.

A. I don't believe that that would go up to the duplicate file. I don't believe that would be sent along.

Q. Okay. Because since you're the supervising file you would be the type of office individual supervising officer that would be a party to this agreement, right?

A. Yes, sir.

Q. Okay.

A. Well, and also Mike had multiple probation officers, as well. I just happened to be his last. He had several before me.

Q. Right.

A. I don't know exactly who it was off the top of my head, but I will say that those would likely be completed before he ever got to me.

Q. Oh, I know.

A. Especially since he came out from a treatment program and his other officer had him for several months

32

1 before I got him.

2 **Q.** Right. Okay. That makes some sense why we can't

3 find this.

4 Let me hand you -- I've collectively -- Sheila

5 handed these to me just before we started the deposition,

6 I've marked it as Exhibit 5.

7 **A. Okay.**

8 **Q.** Can you tell me just what these are and what --

9 I don't want to have to walk through each one, I can read

10 these separately myself at a different time.

11 **A. Okay.**

12 **Q.** But can you just tell me what, collectively, is

13 Exhibit 5?

14 **A. Can I take a look first?**

15 **Q.** Sure.

16 **A. By my count I count ten different documents, a**

17 **collection of notice of citations and violation reports.**

18 **Q.** Okay. Can you just briefly explain to me who

19 creates the document and where does it get sent to?

20 **A. This document, the notice of citations and the**

21 **violation reports, would be either generated by the**

22 **probation officer or in the probation officer's absence**

23 **due to leave of some sort maybe generated by a unit**

24 **supervisor, as well. Then they're sent to a supervisor**

25 **for signature and then they're, quote, final form which**

33

1 **means they're put in a final form status sent to the**

2 **courts after that.**

3 **Q.** Okay.

4 **A. And then one's retained in that working file I**

5 **talked about earlier.**

6 MS. DICKSON: Since Paul was supervising last,

7 they would also go to those districts, those originating

8 districts.

9 **A. Right.**

10 MS. DICKSON: They would be e-mailed.

11 **A. That's correct.**

12 MS. DICKSON: They're emailed and they can get

13 them out of the computer.

14 **Q.** (By Mr. Bagsby) Okay. I think I should maybe

15 clear this up. First off, I'm going to clamp all these

16 things. So the violations that are in five, they do

17 somehow get to the court. Is that right?

18 **A. That's correct. They're automatically sent to**

19 **the court via the out-of-district officer. Well, we send**

20 **them directly to the courts. Here we have a mail that**

21 **goes out directly to the courts here.**

22 MS. DICKSON: If it's a Jefferson County case,

23 yes.

24 **A. Out of district it would go to the**

25 **out-of-district officer --**

34

1 MS. DICKSON: -- and then they send it.

2 **A. -- and it's their responsibility to send it to**

3 **the courts.**

4 **Q.** (By Mr. Bagsby) Okay. Just so I'm getting this

5 clear, you in Hillsboro would -- it would go directly to

6 the Court or it would go to St. Louis County?

7 **A. It would go to St. Louis County, Pike County, his**

8 **originating districts --**

9 **Q.** Okay.

10 **A. -- wherever that may be, those originating**

11 **districts would then disseminate these reports to the**

12 **Court.**

13 **Q.** Okay.

14 **A. The same as if an individual was on probation out**

15 **of Jefferson County living in St. Louis, the reverse would**

16 **be true.**

17 **Q.** Do you have discretion on whether or not --

18 Let's assume -- First off, let's define what you said is

19 the originating --

20 **A. District.**

21 **Q.** -- district. What is the originating district?

22 **A. The originating district in this context means**

23 **the district that originally had him placed on probation**

24 **or paroled. Ultimately the custodian of records is the**

25 **Court. In this case it would be St. Louis County, Lincoln**

35

1 County, and St. Louis -- it looks like St. Louis County

2 and Lincoln County in this case.

3 **Q.** Okay.

4 **A. And St. Louis City, as well.**

5 **Q.** Okay. So you -- Let's play reverse roles then.

6 Let's assume somebody -- you're not the originating

7 office -- Strike that. I'm sorry. I want you to assume

8 you are the originating office, which is the opposite of

9 this scenario.

10 **A. Okay. Correct.**

11 **Q.** Do you have discretion when you receive these --

12 What would you call in Exhibit 5?

13 **A. Violation reports, citations.**

14 **Q.** Okay. If you get one from a supervising office

15 that was not the originating office, do you have

16 discretion on whether or not to forward that to the Court

17 or you're required to forward that?

18 **A. Oh, there's no discretion there. That document**

19 **has to go to the Court.**

20 **Q.** Okay. You're just a pipeline, there's no

21 discretion.

22 **A. The only time there's a discretion is in the**

23 **notice of citation. The notice of citation sometimes is**

24 **held -- for very minor violations is held at the district**

25 **level, we can check a box it either goes to the Court or**

36

```
 1   it does not go to the Court. Generally we send them to
 2   the Court just so everybody's on the same page.
 3       Q.  Okay.
 4       MS. DICKSON:  In our county we do that just
 5   because it's easier.  Can't speak for other districts, but
 6   we send them -- notice of citations go to our courts.
 7       A.  Right.
 8       MR. BAGSBY:  Okay.
 9       MS. DICKSON:  But like another district maybe
10   they don't -- you don't have to do that, but in our
11   district we do.  It's just easier.  This judge wants it,
12   this judge doesn't, so we just send them.
13       MR. BAGSBY:  Okay.  That just makes sense to me.
14   That way it's off your back whether somebody should be
15   revoked or not, it's up to the Court, right?
16       MS. DICKSON:  Correct.
17       A.  It's always up to the Court.
18       MR. BAGSBY:  Right.  No, I get that.  I get that.
19       Q.  And this is what I've marked as Exhibit 6, which
20   Sheila gave me before.  And, again, I don't need to walk
21   through each and every one of these, I can read them
22   later.
23       A.  Okay.
24       Q.  But can you just generally tell me what Exhibit 6
25   is.
                          37
```

```
 1       A.  Exhibit 6 appears to be orders of probation
 2   forwarded from the Court.
 3       Q.  Okay.  Who generates Exhibit 6?
 4       A.  Originally?
 5       Q.  Yeah.
 6       A.  It would be the Court.
 7       Q.  Okay.
 8       A.  It would come over in the form of a court memo.
 9       Q.  Okay.  And do you get copies of these as far as
10   what the conditions of probation are that you're
11   specifically supposed to be supervising the individual of?
12       A.  Absolutely, because on the back you'll notice
13   there's a witnessed by and the probationer's signature.
14   So we review these with the offender, we sign it, they
15   sign it, copies goes to the Court, one copy stays in the
16   file, a copy goes to the offender, and a copy also goes to
17   the prosecuting attorney, I believe.
18       Q.  Okay.  So everybody clearly understands what
19   they're supposed to be doing, right?
20       A.  Right.  This is the definitive rules of the
21   individual's probation right here.
22       MS. DICKSON:  And, so you know, these are typed
23   up.  Like he said, we'll get a court memo that says see
24   attached and these are the special conditions.  This is
25   actually typed up in our computer system, though, from the
                          38
```

```
 1       Q.  Okay.  So when I started this off
 2   with Exhibit 2 about what the court specific orders of
 3   conditions of probation were, this document --
 4       MS. DICKSON:  Yeah.  So this document looks like
 5   this with these conditions, but this is what it's going to
 6   look like in our system.
 7       MR. BAGSBY:  Right.
 8       A.  Sometimes they're even handwritten that come over
 9   from court.
10       MR. BAGSBY:  Okay.
11       Q.  And then Exhibit Number 6 becomes the conditions
12   that the probationer has to follow.
13       A.  Right.
14       Q.  And if they don't follow them you generate
15   Exhibit No. 5 type notices of --
16       A.  Yes.  Yes.
17       Q.  Okay.
18       A.  Some are discretionary.  Not to get too deep into
19   the weeds --
20       Q.  Right.
21       A.  -- some of these are discretionary and can be
22   simply logged as a consult with the officer.  Sometimes
23   they're notices of citation, sometimes they are full on
24   violation reports.
25                          39
```

```
 1       Q.  All right.  Then just to wrap this up, I think
 2   we're just about done, I want to be just absolutely clear
 3   that going back to Exhibit 3, the second page, this
 4   document that is essentially a release between the
 5   probation office, the client, and the service provider,
 6   that would have been maintained here in Hillsboro.
 7       A.  That is not this document.  The release of
 8   information, as it were, yes, would be, as you said, in
 9   this working file here and would not have been forwarded
10   on to the originating districts or the originating courts.
11       Q.  Got you.  And that file has been destroyed
12   because Michael's deceased.
13       A.  That's correct.
14       Q.  All right.  And could you tell me are you allowed
15   to tell me by category what other types of documents would
16   have been in that working file that no longer exist, just
17   so we're not chasing things?
18       MS. DICKSON:  That file would have those reports,
19   those notice of citations, it would have the orders, it
20   would have all those things that Paul received, you know,
21   while he was working with him whether it be from substance
22   abuse counselors or whatever, but we wouldn't keep it here
23   because we're not the originating district.  So as soon as
24   that file gets closed, they destroy it.
25       MR. BAGSBY:  Okay.
                          40
```

1    Q.  And, Mr. Koessel, I think I heard you earlier to
2  say that page two of Exhibit 3, this release, would not be
3  forwarded to the originating office?
4    A.  Again, I have to revert back to tell you that
5  this particular document, this is service guidelines.
6  This is not the release of information.
7    Q.  But it's a document similar to --
8    A.  Yes.  The document that would be the release of
9  information would have been in the file that we had here
10  and would have gotten destroyed along with -- when he
11  expired.
12    Q.  Okay.  Is there any chance I could just get a
13  blank copy of what you guys use as a release?
14    MS. DICKSON:  What we use as a release?
15    MR. BAGSBY:  Yeah.
16    THE WITNESS:  I don't think that would be a
17  problem, do you?
18    MS. DICKSON:  No.
19    A.  I can provide you one here at the end of the day.
20  Well, when we finish up.  It won't take me but a minute to
21  get you one.
22    Q.  (By Mr. Bagsby)  All right.  And that would have
23  been --  Well, you're not allowed to say.
24    So whatever --  Could we just go off and have you go
25  get it so I can mark it as an exhibit and then we'll be

41

1  done?
2    A.  Sure.
3    (Brief recess.)
4    Q.  (By Mr. Bagsby)  Okay.  Mr. Koessel, you went
5  while we were on break and obtained the type of release
6  that you would have had for a healthcare provider and a
7  probationer to sign off on to allow the free flow exchange
8  of information as related to that treatment.  Is that
9  correct?
10    A.  That is correct.
11    Q.  And that's what I've now marked as Exhibit 8.
12    A.  Right.  That allows the information to go from
13  the treatment provider to us and confidential information
14  such as urinalysis results to go back to the treatment
15  provider.  Without that we can't disclose anything to
16  anybody --
17    Q.  Got you.
18    A.  -- along the lines of personal information.
19  That's not public information.
20    Q.  Right.  Is there a time limit that the provider
21  has to tell you whether or not somebody has either missed
22  an appointment or they're abusing, they're testing
23  positive, things of that sort?
24    A.  I don't believe there's a set guideline other
25  than if you read the guidelines I think it's a two working

42

1  day business period.  But, other than that, I don't think
2  there's any set --
3    MS. DICKSON:  And that's when they sign this with
4  us.  You know, if it's a different treatment program and
5  they don't use that --
6    A.  Right.
7    MS. DICKSON:  I don't know what they would use as
8  their guidelines.
9    A.  Right.
10    MS. DICKSON:  It's not the same, obviously.
11    Q.  (By Mr. Bagsby)  Is that essentially what
12  Exhibit 3 is, is a guideline?
13    A.  Yes, sir.  It says right here:  Guidelines.
14    Q.  Okay.
15    A.  This is a client treatment recovery services
16  guidelines.
17    Q.  Okay.  When you just mentioned the 48-hour
18  thing --
19    A.  That's from this.
20    Q.  Oh, from this?
21    A.  That's from this guideline.  It says right here
22  two business days.
23    Q.  Right.
24    A.  Actually you pointed it out to me earlier, two
25  business days.

43

1    Q.  Right.  Have you seen that -- I mean, is that in
2  practice reality that these providers usually tell you
3  within two days?
4    A.  I think they try to get information to us as
5  quickly as possible and as expeditiously as possible.
6  Whether or not it always holds to that two-day rule I
7  couldn't say with every treatment.  We have thousands and
8  thousands of clients going to dozens of different
9  treatment providers.  There's a lot of moving parts here.
10  So to say everything would come in in two days, I couldn't
11  specify.
12    Q.  Okay.  On your Exhibit 8, can you just explain to
13  me where the provider signs and where the probationer
14  signs?
15    A.  Yeah.  I can show you.
16    Q.  Okay.
17    A.  The signatures --
18    Q.  You're on the second page?
19    A.  Yes, sir.  It's on page two.  Here at the top,
20  the client would sign there, and it will have other
21  information as you can read through and discern for
22  yourself it's fairly self explanatory.
23    Q.  Okay.
24    A.  Here would be the signature of the consumer,
25  which would be the offender or the client.  The date.  The

44

1 witness would be the probation officer or, I guess, any
2 individual who was utilizing this, a DFS worker or
3 whatever.
4     Q.   Okay.
5     A.   The witness would do this and they would date it.
6 And if there's a minor there's a block for parent or
7 guardian to sign. Notice of revocation, they can also
8 sign here if they decide to revoke this. They can revoke
9 this at any time. So say they stumble upon something they
10 don't want their probation officer to know about, they can
11 sign this immediately and say: I don't want anybody to
12 know anything about this, I want to revoke this right now,
13 and they can pull back that permission. It's their
14 information so they can share with it or pull it back as
15 they wish.
16     Q.   Okay.
17     A.   So those are the places that one would sign on
18 this document.
19     Q.   Out of curiosity, I mean, could they really
20 revoke -- Let's assume somebody's ordered to attend a
21 12-week outpatient program, just the abstract. Three
22 weeks into it you get a hint that maybe they're not
23 completing the program and they have signed the
24 revocation. Are they really allowed to sign the
25 revocation?

                          45

1     A.   Yes. The treatment provider would most likely
2 let us know immediately --
3     Q.   That they did sign --
4     A.   -- that they signed the revocation and we can't
5 tell you anymore information. At that point in time my
6 approach would be simply to tell the offender: You've
7 revoked that, that's your prerogative, however understand
8 that I cannot verify any further treatment with that
9 therefore it could jeopardize your status of probation.
10     Q.   Got you.
11 Sheila, do you agree with that?
12     MS. DICKSON:  Yes.
13     MR. BAGSBY:  All right. I don't have any other
14 questions. I really appreciate your cooperation.
15     Have you ever had your deposition taken before?
16     THE WITNESS:  It's been a while.
17     MR. BAGSBY:  Okay. There's this rule about
18 depositions. You are allowed the right of what's called
19 presentment. In other words, she's going to type this up
20 question, answer, question, answer, question, answer, and
21 you're allowed to review it for spelling mistakes only,
22 what you can't do is add to an answer, delete from an
23 answer --
24     THE WITNESS:  Mm-hm.
25     MR. BAGSBY:  -- but it's your right of

                          46

1 presentment whether you want to see it and review it for
2 any misspellings.
3     THE WITNESS:  Would I be allowed to keep a copy,
4 sir?
5     (Brief discussion is held off the record.)
6     MR. BAGSBY:  Or you can waive the review of it.
7     THE WITNESS:  I would like to review it,
8 personally.
9
10                    * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                          47

WITNESS: PAUL KOESSEL

                   ERRATA SHEET

In Re the Matter Of:  ESTATE OF MICHAEL PATRICK SCHWARTZ

Upon reading the deposition and before subscribing
thereto, the deponent indicated the following changes
should be made:


Page _____ Line _____ Should read:
Reason assigned for change:


Page _____ Line _____ Should read:
Reason assigned for change:


Page _____ Line _____ Should read:
Reason assigned for change:


Page _____ Line _____ Should read:
Reason assigned for change:


Page _____ Line _____ Should read:
Reason assigned for change:


Page _____ Line _____ Should read:
Reason assigned for change:


eki(Koessel)        DEPONENT: _____

                          48

1   I, PAUL KOESSEL, do hereby state that I have read
2   the foregoing questions and answers in this transcript of
3   my deposition, page 4 through and including page 58, and
4   that this is a true and accurate (corrected) report of
    said answers given in response to the questions propounded
    and appearing herein.

7
8
9   _____
    PAUL KOESSEL

10
11  Subscribed and sworn before me this _____ day of
12  January, 2016.
13
14  _____
    NOTARY PUBLIC
15
16
17  My commission expires _____.
18
19
20
21
22
23
24
25  eki

                    49

---

1                    CERTIFICATE
2       I, Elizabeth K. Immekus, Certified Court Reporter
3   within and for the State of Missouri, do hereby certify
4   that, pursuant to notice and agreement, there came before
5   me at the law offices of Office of Probation and Parole,
6   4621 Yaeger Road, in the City of Hillsboro, State of
7   Missouri,
8                    PAUL KOESSEL,
9   who was by me first duly sworn to tell the whole truth of
10  his knowledge touching the matter in controversy
11  aforesaid; that he was examined on the day, between the
12  hours, and at the place in that behalf first aforesaid;
13  that his examination was taken in machine shorthand, later
14  reduced to typewriting, and submitted to his for
15  signature; and that the deposition is now herewith
16  returned.
17      IN WITNESS WHEREOF, I have hereunto subscribed my
18  name on this ___ day of January, 2016.
19
20
21  _____
    Elizabeth K. Immekus, CCR #484

23
24
25
                    50

---

HULL REPORTING
834 Madison Street
St. Charles, MO 63301
(636) 946-1354


January 5, 2016


Mr. Paul Koessel
Department of Corrections
4621 Yaeger Road
Hillsboro, MO 63050

In Re:   In Re the Matter Of:  Estate of Michael Patrick
         Schwartz; Case No. 15JE-PR00407

Dear Mr. Koessel:

    Attached via email please find your December 21,
2015, deposition in this matter.  Pages 48 and 49 of the
transcript may be printed off as your original signature
page and correction sheet to be utilized when you review
the transcript.

    After you carefully review the transcript, please
return to Mr. Larry Bagsby the signed and notarized
signature page and the signed correction sheet so that he
may attach them to the Court's original transcript.

    Thank you for your cooperation in this matter.

Sincerely,


Elizabeth K. Immekus, CCR
Attachment

                    51

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, MISSOURI
PROBATE DIVISION

In Re the Matter Of:     ) January 5, 2016
                         )
ESTATE OF MICHAEL        ) Case No.   15JE-PR00407
PATRICK SCHWARTZ,        )
                         )
          Deceased.      )

## REPORTER'S CERTIFICATE

I hereby certify that the original deposition of

PAUL KOESSEL, taken December 21, 2015, has been delivered

to:  The Bagsby Law Firm, 125 N. Main Street, Suite 204,

St. Charles, MO, 63301, and the following charges have

been made and are expected to be paid in the normal course

of business:

## STATEMENT OF DEPOSITION COSTS

TOTAL FOR THE ESTATE:                    $282.50

_____
Elizabeth K. Immekus, CCR #484
HULL REPORTING
834 Madison Street
St. Charles, MO 63301
(636) 946-1354

52

# #

**#484** [3] - 1:22, 50:21, 52:22

# 1

**1** [2] - 5:20, 7:18
**12-week** [1] - 45:21
**125** [3] - 3:3, 52:11
**15JE** [4] - 1:4, 2:4, 51:9, 52:4
**15JE-PR00407** [4] - 1:4, 2:4, 51:9, 52:4
**1991** [1] - 4:17
**1994** [2] - 4:20, 4:25

# 2

**2** [5] - 7:19, 7:21, 9:7, 9:19, 39:3
**2001** [1] - 5:1
**2014** [1] - 11:3
**2015** [3] - 1:10, 51:12, 52:10
**2016** [5] - 2:15, 49:12, 50:18, 51:5, 52:3
**204** [2] - 3:3, 52:11
**2095** [1] - 3:7
**20th** [1] - 11:3
**21** [3] - 1:10, 51:11, 52:10
**217.362** [2] - 9:13, 10:4
**21st** [1] - 2:15

# 3

**3** [8] - 21:6, 22:22, 24:18, 28:4, 32:1, 40:3, 41:2, 43:12

# 4

**4** [3] - 29:3, 29:14, 49:3
**4621** [3] - 2:18, 50:6, 51:7
**48** [1] - 51:12
**48-hour** [1] - 43:17
**49** [1] - 51:12

# 5

**5** [6] - 33:6, 33:13, 36:12, 39:16, 51:5,

**52** [1] - 49:3

# 6

**6** [5] - 37:19, 37:24, 38:1, 38:3, 39:12
**63050** [2] - 3:12, 51:8
**63052** [1] - 3:7
**63301** [5] - 1:24, 3:4, 51:3, 52:12, 52:23
**636** [3] - 1:25, 51:3, 52:24

# 7

**7** [1] - 17:12

# 8

**8** [2] - 42:11, 44:12
**834** [3] - 1:24, 51:2, 52:23

# 9

**946-1354** [3] - 1:25, 51:3, 52:24

# A

**A.D** [1] - 2:15
**able** [2] - 24:12, 28:21
**absence** [1] - 33:22
**absolutely** [3] - 7:17, 38:12, 40:2
**abstract** [1] - 45:21
**abuse** [3] - 11:9, 27:15, 40:22
**abusing** [1] - 42:22
**accepted** [3] - 17:8, 17:9, 17:15
**according** [1] - 25:10
**accordingly** [1] - 16:10
**accurate** [1] - 49:4
**add** [1] - 46:22
**address** [1] - 27:23
**adhere** [1] - 13:11
**adjacent** [1] - 10:9
**adjudicated** [1] - 5:7
**adversarial** [1] - 19:11
**afford** [1] - 19:22
**aforesaid** [2] - 50:11, 50:12
**afternoon** [1] - 2:17

**agree** [4] - 24:2, 27:10, 27:15, 46:11
**agreement** [2] - 28:6, 32:13, 50:4
**ahead** [1] - 19:6
**alleviate** [1] - 24:10
**allow** [2] - 24:9, 42:7
**allowed** [7] - 6:18, 40:14, 41:23, 45:24, 46:18, 46:21, 47:3
**allows** [5] - 23:3, 23:8, 23:12, 24:4, 42:12
**America** [1] - 18:7
**ancillary** [1] - 10:6
**answer** [7] - 14:6, 16:7, 46:20, 46:22, 46:23
**answers** [2] - 49:2, 49:5
**anyway** [1] - 18:14
**APPEARANCES** [1] - 3:1
**appearing** [2] - 5:12, 49:6
**applied** [1] - 6:23
**appointment** [1] - 42:22
**appointments** [3] - 24:23, 25:6, 26:4
**appreciate** [1] - 46:14
**approach** [1] - 46:6
**approved** [1] - 17:6
**ARCA** [5] - 19:25, 20:3, 20:25, 22:5, 29:3
**area** [10] - 20:7, 20:8, 20:13, 20:16, 20:20, 20:22, 20:23, 21:1, 25:21, 28:8
**areas** [1] - 12:25
**Arnold** [1] - 20:23
**Assessment** [1] - 25:20
**assign** [1] - 13:23
**assigned** [7] - 14:1, 48:8, 48:11, 48:14, 48:17, 48:20, 48:23
**Assisted** [1] - 18:7
**assume** [9] - 6:18, 13:5, 15:3, 22:9, 35:18, 36:6, 36:7, 45:20
**assuming** [4] - 13:20, 21:24, 25:1, 29:13
**attach** [1] - 51:16
**attached** [3] - 8:5, 10:9, 38:24
**Attached** [1] - 51:11
**Attachment** [1] -

**attend** [1] - 45:20
**attorney** [3] - 7:8, 26:21, 38:17
**attorney-client** [1] - 26:21
**automatically** [1] - 34:18
**aware** [2] - 25:6, 28:14

# B

**Bachelor** [1] - 4:14
**background** [1] - 4:13
**BAGSBY** [34] - 3:3, 4:5, 19:4, 19:9, 19:17, 19:24, 20:4, 20:10, 20:12, 20:14, 20:21, 20:24, 23:25, 27:10, 27:19, 27:22, 27:25, 28:10, 28:13, 28:23, 29:1, 31:2, 37:8, 37:13, 37:18, 39:2, 39:8, 39:11, 40:25, 41:15, 46:13, 46:17, 46:25, 47:6
**Bagsby** [11] - 3:4, 21:3, 24:8, 31:10, 34:14, 35:4, 41:22, 42:4, 43:11, 51:15, 52:11
**barely** [1] - 18:12
**based** [1] - 14:12
**basic** [1] - 8:20
**bear** [1] - 29:7
**bears** [1] - 5:22
**becomes** [1] - 39:12
**behalf** [4] - 1:9, 2:14, 4:2, 50:12
**benefit** [1] - 15:21
**between** [5] - 2:15, 9:16, 23:9, 40:4, 50:11
**Bill** [1] - 25:20
**bit** [1] - 12:17
**blank** [1] - 41:13
**block** [1] - 45:6
**Board** [5] - 2:17, 4:10, 5:3, 10:1, 10:17
**board** [2] - 5:8, 10:18
**Boulevard** [1] - 18:13
**box** [1] - 36:25
**Box** [1] - 3:7
**break** [1] - 42:5
**Brief** [2] - 20:1, 42:3, 47:5
**briefly** [2] - 4:25, 33:18
**bring** [2] - 12:19, 17:4

**business** [4] - 43:1, 43:22, 43:25, 52:14
**BY** [1] - 4:5

# C

**cannot** [4] - 6:8, 27:18, 28:24, 46:8
**Cape** [1] - 20:18
**carefully** [1] - 51:14
**Case** [4] - 1:4, 2:4, 51:9, 52:4
**case** [34] - 5:10, 6:4, 6:10, 8:10, 9:6, 9:18, 10:7, 10:22, 10:24, 13:8, 16:2, 16:4, 16:18, 16:20, 16:21, 16:25, 17:8, 22:4, 22:8, 25:23, 25:24, 27:6, 29:21, 30:21, 30:24, 31:20, 31:23, 34:22, 35:25, 36:2
**cases** [1] - 10:21
**category** [1] - 40:15
**CCR** [4] - 1:22, 50:21, 51:20, 52:22
**center** [3] - 17:5, 20:19, 21:19
**Centers** [1] - 18:7
**certain** [2] - 2:21, 29:5
**CERTIFICATE** [2] - 50:1, 52:8
**Certified** [2] - 2:20, 50:2
**certify** [2] - 50:3, 52:9
**chance** [1] - 41:12
**change** [6] - 48:8, 48:11, 48:14, 48:17, 48:20, 48:23
**changed** [1] - 19:16
**changes** [1] - 48:4
**charges** [1] - 52:12
**Charles** [5] - 1:24, 3:4, 51:3, 52:12, 52:23
**chasing** [1] - 40:17
**check** [5] - 17:4, 18:3, 31:19, 36:25
**choice** [1] - 12:3
**choose** [1] - 11:11
**chronological** [1] - 13:25
**Circuit** [1] - 2:21
**CIRCUIT** [3] - 1:1, 2:1, 52:1
**circumstance** [1] - 14:20
**circumstances** [2] - 14:12, 16:22

citation [3] - 36:23,
39:24
citations [6] - 30:21,
33:17, 33:20, 36:13,
37:6, 40:19
City [4] - 2:18, 31:2,
36:4, 50:6
clamp [1] - 34:15
clarify [1] - 9:16
class [1] - 8:22
clear [4] - 7:15, 34:15,
35:5, 40:2
clearly [2] - 15:22,
38:18
clerical [1] - 30:18
client [13] - 6:3, 13:12,
21:19, 24:14, 25:24,
26:21, 27:17, 27:24,
28:22, 40:5, 43:15,
44:20, 44:25
clients [3] - 5:6, 27:21,
44:8
closed [1] - 40:24
closing [1] - 30:18
collect [2] - 31:12,
31:18
collection [2] - 29:3,
33:17
collectively [2] - 33:4,
33:12
colloquy [1] - 20:2
column [3] - 21:15,
24:22, 25:3
coming [2] - 10:3,
17:20
comment [5] - 6:1,
6:3, 17:17, 19:3,
29:6
commission [1] -
49:17
common [3] - 8:11,
24:17, 26:20
community [1] - 5:8
Community [1] - 21:8
complete [6] - 11:8,
13:6, 13:18, 13:21,
14:9, 28:1
completed [1] - 32:21
completing [4] -
24:24, 25:7, 25:13,
45:23
completion [1] - 29:5
compliance [4] - 6:24,
29:22, 29:23, 29:24
complying [1] - 22:25
computer [3] - 23:22,
34:13, 38:25
Comtrea [13] - 18:15,
18:18, 19:20, 20:13,

22:2, 22:17, 25:16,
27:13, 28:5, 28:7
concerns [1] - 26:9
concrete [2] - 12:17,
16:11
condition [1] - 13:19
conditions [15] - 6:17,
8:6, 9:8, 9:23, 11:2,
13:24, 22:21, 28:2,
29:24, 38:10, 38:24,
39:4, 39:6, 39:12
confidential [1] -
42:13
confirm [1] - 18:4
consequences [1] -
16:15
consult [1] - 39:23
consulted [1] - 7:7
consumer [1] - 44:24
contacts [1] - 26:12
contained [2] - 7:21,
17:13
context [2] - 22:1,
35:22
continue [1] - 16:13
continued [1] - 14:16
continuing [1] - 15:7
contract [10] - 18:15,
18:24, 19:19, 19:25,
20:15, 20:18, 21:1,
21:13, 22:6, 22:11
contracted [1] - 28:9
contracts [1] - 22:1
controversy [1] -
50:10
cooperate [1] - 15:5
cooperation [2] -
46:14, 51:17
copies [4] - 31:19,
38:9, 38:15
copy [7] - 8:5, 29:19,
38:15, 38:16, 41:13,
47:3
correct [23] - 5:10,
5:11, 5:14, 7:10, 8:3,
8:7, 8:8, 9:14, 10:13,
10:24, 11:5, 11:6,
12:7, 21:21, 26:25,
27:2, 34:11, 34:18,
36:10, 37:16, 40:13,
42:9, 42:10
corrected [1] - 49:4
correction [2] - 51:13,
51:15
Corrections [9] - 9:18,
9:22, 11:14, 18:25,
19:16, 19:19, 21:8,
28:17, 51:7
COSTS [1] - 52:16

counseling [1] -
14:23, 16:9
Counseling [1] -
25:20
counselors [2] - 26:3,
40:22
count [2] - 33:16
COUNTY [3] - 1:1, 2:1,
52:1
county [1] - 37:4
County [13] - 2:22,
8:8, 30:25, 31:1,
34:22, 35:6, 35:7,
35:15, 35:25, 36:1,
36:2
couple [1] - 26:1
course [1] - 52:13
Court [24] - 2:20, 2:22,
10:23, 11:4, 12:12,
13:20, 14:1, 16:16,
29:22, 30:20, 35:6,
35:12, 35:25, 36:16,
36:19, 36:25, 37:1,
37:2, 37:15, 37:17,
38:2, 38:6, 38:15,
50:2
court [11] - 6:19, 7:20,
8:10, 13:7, 34:17,
34:19, 38:8, 38:23,
39:1, 39:3, 39:10
COURT [3] - 1:1, 2:1,
52:1
Court's [6] - 9:12,
9:24, 14:2, 30:16,
30:23, 51:16
courts [7] - 5:7, 34:2,
34:20, 34:21, 35:3,
37:6, 40:10
cover [3] - 8:1, 9:19
covered [1] - 7:18
creates [1] - 33:19
criminal [1] - 8:10
curiosity [1] - 45:19
custodian [1] - 35:24

# D

date [2] - 44:25, 45:5
dated [1] - 11:3
days [10] - 13:9,
13:10, 16:12, 25:8,
43:22, 43:25, 44:3,
44:10
dealing [2] - 16:25,
21:25
Dear [1] - 51:10
Deceased [3] - 1:6,
2:6, 52:5
deceased [1] - 40:12

2:15, 51:11, 52:10
decide [3] - 15:24,
15:25, 45:8
decision [1] - 10:19
deemed [1] - 12:9
deep [1] - 39:19
define [1] - 35:18
definitely [3] - 11:12,
12:19, 13:16
definitive [1] - 16:6,
38:20
delete [1] - 46:22
delivered [1] - 52:10
Delmar [1] - 18:12
Department [15] -
9:18, 9:22, 11:14,
18:25, 19:12, 19:15,
19:19, 19:20, 19:25,
21:7, 21:8, 23:4,
28:16, 51:7
department [1] - 30:1
deponent [1] - 48:4
DEPONENT [1] -
48:25
DEPOSITION [1] -
52:16
deposition [10] - 6:16,
7:2, 7:9, 33:5, 46:15,
48:4, 49:3, 50:15,
51:12, 52:9
Deposition [2] - 1:9,
2:13
depositions [1] -
46:18
describe [1] - 5:2
designated [1] - 9:25
destroy [1] - 40:24
destroyed [5] - 31:23,
32:6, 32:7, 40:11,
41:10
detail [2] - 9:4, 26:2
details [1] - 9:1
determining [1] -
10:12
DFS [1] - 45:2
DICKSON [40] - 19:2,
19:6, 19:12, 19:15,
19:18, 20:3, 20:5,
20:11, 20:13, 20:17,
20:22, 21:2, 23:20,
24:1, 27:12, 27:20,
27:23, 28:5, 28:11,
28:20, 28:24, 30:25,
31:3, 34:6, 34:10,
34:12, 34:22, 35:1,
37:4, 37:9, 37:16,
38:22, 39:5, 40:18,
41:14, 41:18, 43:3,
43:7, 43:10, 46:12

dictate [2] - 12:1,
14:21
dictating [1] - 11:20
different [11] - 12:22,
14:12, 14:13, 14:22,
20:19, 23:16, 23:21,
33:10, 33:16, 43:4,
44:8
DIRECT [1] - 4:4
directing [1] - 8:2
directly [5] - 6:23,
22:7, 34:20, 34:21,
35:5
discern [1] - 44:21
discharge [1] - 9:20
disclose [1] - 42:15
discretion [6] - 35:17,
36:11, 36:16, 36:18,
36:21, 36:22
discretionary [2] -
39:19, 39:22
discuss [2] - 6:8, 6:18
discussion [2] - 20:1,
47:5
disseminate [1] -
35:11
distinction [1] - 9:16
district [15] - 30:12,
30:24, 31:12, 34:19,
34:24, 34:25, 35:20,
35:21, 35:22, 35:23,
36:24, 37:9, 37:11,
40:23
district's [1] - 30:16
districts [7] - 31:6,
34:7, 34:8, 35:8,
35:11, 37:5, 40:10
DIVISION [3] - 1:1,
2:1, 52:1
DMH [3] - 20:6, 20:18,
20:19
document [22] - 6:22,
7:21, 18:6, 21:12,
22:20, 22:22, 23:7,
26:15, 26:18, 28:3,
30:22, 33:19, 33:20,
36:18, 39:4, 39:5,
40:4, 40:7, 41:5,
41:7, 41:8, 45:18
documents [10] -
22:17, 27:6, 29:4,
29:13, 29:17, 30:10,
31:12, 31:17, 33:16,
40:15
done [2] - 40:2, 42:1
down [1] - 5:1
dozens [1] - 44:8
drags [1] - 12:18
drive [1] - 23:22

2

drivers [1] - 43:19
due [1] - 33:23
duly [2] - 4:2, 50:9
dummy [1] - 11:8
duplicate [1] - 32:10
duplicated [1] - 31:8
during [2] - 5:24, 7:2

# E

e-mailed [1] - 34:10
easier [2] - 37:5, 37:11
educational [1] - 4:13
eight [1] - 2:16
either [6] - 5:6, 19:24, 28:13, 33:21, 36:25, 42:21
eki [1] - 49:25
eki(Koessel [1] - 48:25
Elizabeth [6] - 1:22, 2:19, 50:2, 50:21, 51:20, 52:22
email [2] - 27:5, 51:11
emailed [1] - 34:12
employed [1] - 4:18
employment [1] - 4:9
encompassed [1] - 16:20
end [3] - 10:19, 30:10, 41:19
enter [1] - 11:8
ERRATA [1] - 48:2
especially [1] - 32:24
essentially [2] - 40:4, 43:11
ESTATE [6] - 1:4, 2:4, 2:23, 48:3, 52:4, 52:17
Estate [5] - 1:9, 2:14, 3:2, 4:3, 51:9
etc [1] - 26:8
everyday [1] - 26:2
exactly [3] - 23:10, 24:15, 32:20
examination [1] - 50:13
EXAMINATION [1] - 4:4
examined [3] - 2:14, 4:2, 50:11
example [2] - 25:16, 26:17
exchange [2] - 23:8, 42:7
execute [1] - 28:3
Exhibit [29] - 5:19, 7:18, 7:19, 7:21, 9:7, 9:19, 17:12, 21:6,
29:3, 29:14, 32:1, 33:6, 33:13, 36:12, 37:19, 37:24, 38:1, 38:3, 39:3, 39:12, 39:16, 40:3, 41:2, 42:11, 43:12, 44:12
exhibit [1] - 41:25
exhibiting [1] - 26:9
exhibits [1] - 30:9
exist [1] - 40:16
existed [1] - 24:14
exists [1] - 22:22
expectations [2] - 8:20, 9:5
expected [1] - 52:13
expeditiously [1] - 44:5
experiences [2] - 5:24, 28:14
expired [3] - 30:17, 31:24, 41:11
expires [1] - 49:17
explain [7] - 6:5, 9:4, 11:9, 13:15, 18:23, 33:18, 44:12
explanatory [1] - 44:22

# F

facilities [1] - 17:16
facility [4] - 22:10, 25:5, 28:2, 28:12
fact [1] - 17:8
fairly [4] - 8:9, 8:11, 25:19, 44:22
falls [1] - 25:3
familiar [6] - 7:20, 17:18, 18:10, 21:6, 22:1, 25:17
far [8] - 8:14, 16:10, 20:3, 21:15, 21:22, 38:9
faxed [1] - 27:5
feedback [1] - 11:21
Fenton [1] - 25:21
Festus [1] - 20:23
fifteen [1] - 30:12
figure [1] - 30:9
file [32] - 6:19, 7:20, 16:9, 29:18, 29:19, 30:12, 30:13, 30:16, 30:17, 30:23, 31:7, 31:8, 31:9, 31:12, 31:13, 31:17, 31:21, 31:23, 31:25, 32:3, 32:5, 32:10, 32:11, 34:4, 38:16, 40:9,
40:24, 41:9
filing [1] - 30:8
fill [1] - 22:17
final [2] - 33:25, 34:1
financial [1] - 12:21
finish [1] - 41:20
FIRM [1] - 3:3
Firm [1] - 52:11
First [1] - 35:18
first [9] - 4:7, 8:16, 8:20, 8:24, 33:14, 34:15, 50:9, 50:12
five [1] - 34:16
flexibility [1] - 12:18
flexible [1] - 12:16
flow [2] - 23:12, 42:7
follow [2] - 39:13, 39:15
following [2] - 48:4, 52:12
follows [1] - 4:3
FOR [1] - 52:17
forceful [1] - 15:8
foregoing [1] - 49:2
forenoon [1] - 2:16
form [14] - 21:9, 23:1, 23:3, 23:15, 23:16, 23:22, 24:3, 24:6, 27:12, 28:12, 33:25, 34:1, 38:8
forms [1] - 31:16
forty [1] - 16:12
forward [2] - 36:16, 36:17
forwarded [3] - 38:2, 40:9, 41:3
four [3] - 13:6, 24:21, 30:9
free [2] - 19:23, 23:12, 42:7
frequently [1] - 22:18
front [1] - 17:21
full [3] - 4:6, 14:23, 39:24
full-on [1] - 14:23
function [1] - 25:12

# G

general [3] - 6:13, 6:20, 29:12
general's [1] - 7:8
generalities [1] - 16:2
generally [14] - 5:2, 7:20, 8:16, 8:19, 8:21, 14:11, 17:7, 18:18, 21:18, 25:22, 25:23, 37:1, 37:24
generate [1] - 33:2
15:23, 16:21, 39:15
generated [2] - 33:21, 33:23
generates [2] - 17:24, 38:3
given [2] - 15:1, 49:5
glad [1] - 11:24
goal [1] - 13:10
graduated [1] - 15:9
great [1] - 9:4
guardian [1] - 45:7
guess [5] - 5:23, 6:5, 7:11, 12:3, 45:1
guideline [3] - 42:24, 43:12, 43:21
guidelines [5] - 41:5, 42:25, 43:8, 43:13, 43:16
guys [2] - 28:19, 41:13

# H

hand [5] - 5:19, 7:19, 17:11, 21:5, 33:4
handed [1] - 33:5
handwritten [1] - 39:9
hard [3] - 12:17, 13:15, 29:19
head [1] - 32:21
health [1] - 19:2
Health [6] - 19:13, 19:20, 19:25, 21:8, 23:5, 28:16
healthcare [1] - 42:6
heard [1] - 41:1
held [4] - 20:1, 36:24, 47:5
help [2] - 11:18, 17:11
hereby [3] - 49:1, 50:3, 52:9
herein [1] - 49:6
hereunto [1] - 50:17
herewith [1] - 50:15
High [1] - 20:23
Hillsboro [7] - 2:19, 3:12, 4:21, 35:5, 40:6, 50:6, 51:8
hint [1] - 45:22
HIPAA [1] - 24:10
history [1] - 4:23
hit [1] - 30:8
hm [4] - 9:21, 18:2, 30:3, 46:24
holds [1] - 44:6
honest [1] - 26:16
honestly [1] - 17:22
host [1] - 12:22
hours [2] - 2:15, 50:12
52:22
hundred [2] - 5:6, 13:9
hypotheticals [1] - 6:12

# I

idea [3] - 7:4, 21:2, 21:4
immediately [3] - 8:3, 45:11, 46:2
Immekus [6] - 1:22, 2:19, 50:2, 50:21, 51:20, 52:22
Imperial [1] - 3:7
important [3] - 13:21, 13:24, 14:3
impose [1] - 15:13
impossible [1] - 13:9
IN [4] - 1:1, 2:1, 50:17, 52:1
including [1] - 49:3
indefinite [2] - 13:15, 13:16
indicated [1] - 48:4
individual [14] - 5:15, 11:13, 13:13, 14:12, 16:4, 16:14, 16:23, 18:5, 23:4, 32:12, 35:14, 38:11, 45:2
individual's [2] - 29:22, 38:21
individuals [2] - 11:12, 26:9
inform [1] - 24:22
information [27] - 17:4, 23:7, 23:9, 23:13, 23:14, 23:23, 24:3, 24:4, 24:5, 24:11, 27:17, 27:24, 29:3, 29:7, 39:1, 40:8, 41:6, 41:9, 42:8, 42:12, 42:13, 42:18, 42:19, 44:4, 44:21, 45:14, 46:5
initiated [1] - 17:3
input [1] - 11:18
instance [7] - 14:14, 14:15, 14:16, 14:17, 22:20, 24:18, 28:14
institution [2] - 7:25, 18:10
insurance [2] - 18:17, 19:22
intake [2] - 8:23
interchange [1] - 24:4
interviewing [4] - 11:15, 11:16, 11:17,

**intimately** [1] - 17:18
**introduce** [2] - 8:16, 8:19
**issue** [3] - 13:2, 13:4, 18:17
**issued** [1] - 8:10
**issues** [3] - 12:22, 21:25
**item** [2] - 16:25, 24:21
**itself** [3] - 12:6, 18:6, 18:11

## J

**January** [4] - 49:12, 50:18, 51:5, 52:3
**JEFFERSON** [3] - 1:1, 2:1, 52:1
**Jefferson** [3] - 2:22, 34:22, 35:15
**jeopardize** [1] - 46:9
**jog** [1] - 5:20
**judge** [6] - 10:11, 15:12, 15:13, 15:24, 37:11, 37:12
**jump** [1] - 32:1
**June** [1] - 30:5

## K

**K-O-E-S-S-E-L** [1] - 4:8
**KARIE** [1] - 3:6
**Karie** [1] - 3:8
**keep** [5] - 15:9, 16:13, 27:1, 40:22, 47:3
**kind** [5] - 20:22, 24:6, 24:16, 25:12, 28:6
**kinds** [1] - 14:14
**knowledge** [2] - 6:14, 50:10
**KOESSEL** [8] - 1:9, 2:13, 4:1, 48:1, 49:1, 49:9, 50:8, 52:10
**Koessel** [5] - 4:7, 41:1, 42:4, 51:6, 51:10

## L

**laid** [1] - 11:2
**Larry** [2] - 3:4, 51:15
**last** [2] - 32:17, 34:6
**latitude** [1] - 12:3
**law** [1] - 50:5
**LAW** [2] - 3:3, 3:6
**Law** [1] - 52:11

**leave** [1] - 33:23
**left** [2] - 21:15, 24:21
**legit** [1] - 11:24
**legitimate** [2] - 17:5, 18:4
**less** [1] - 11:17
**letters** [1] - 31:16
**level** [2] - 15:10, 36:25
**license** [1] - 31:20
**licensed** [2] - 17:6, 17:9
**likely** [3] - 10:6, 32:21, 46:1
**limit** [1] - 42:20
**limitations** [2] - 6:6, 7:8
**limits** [1] - 13:5
**Lincoln** [4] - 8:8, 30:25, 35:25, 36:2
**Line** [6] - 48:7, 48:10, 48:13, 48:16, 48:19, 48:22
**lines** [1] - 42:18
**list** [1] - 17:12
**lists** [1] - 18:7
**live** [1] - 12:24
**living** [1] - 35:15
**LLC** [1] - 3:6
**local** [2] - 8:13, 29:16
**logged** [1] - 39:23
**logical** [1] - 16:14
**long-term** [1] - 10:3
**look** [6] - 23:11, 24:21, 31:4, 31:5, 33:14, 39:7
**looks** [3] - 21:13, 36:1, 39:5
**Louis** [15] - 4:25, 18:13, 20:6, 20:7, 21:1, 22:10, 31:1, 31:2, 35:6, 35:7, 35:15, 35:25, 36:1, 36:4
**Louis's** [1] - 22:13

## M

**machine** [1] - 50:13
**Madison** [3] - 1:24, 51:2, 52:23
**mail** [1] - 34:20
**mailed** [3] - 6:15, 29:2, 34:10
**Main** [2] - 3:3, 52:11
**maintained** [1] - 40:6
**major** [1] - 26:9
**majority** [1] - 18:14
**mark** [1] - 41:25

**marked** [6] - 5:19, 7:19, 17:12, 21:5, 29:2, 33:6, 37:19, 42:11
**material** [1] - 29:18
**matter** [3] - 50:10, 51:12, 51:17
**Matter** [6] - 1:3, 2:3, 2:23, 48:3, 51:9, 52:3
**Max** [1] - 25:20
**mean** [7] - 13:5, 13:19, 19:10, 23:20, 30:4, 44:1, 45:19
**means** [2] - 34:1, 35:22
**meant** [1] - 18:23
**measure** [2] - 13:12, 13:13
**meet** [1] - 28:6
**memo** [2] - 38:8, 38:23
**memory** [1] - 5:21
**Mental** [7] - 19:2, 19:12, 19:20, 19:25, 21:8, 23:4, 28:16
**mentioned** [1] - 43:17
**merely** [6] - 11:20, 14:21, 14:23, 15:16, 23:1, 23:3
**MICHAEL** [5] - 1:4, 2:4, 2:23, 48:3, 52:4
**Michael** [14] - 1:9, 2:14, 3:2, 3:10, 4:3, 5:16, 5:17, 5:24, 6:16, 8:2, 22:4, 29:7, 31:24, 51:9
**Michael's** [2] - 22:8, 40:12
**middle** [1] - 12:25
**might** [3] - 27:6, 31:8, 31:20
**Mike** [2] - 30:17, 32:16
**Mike's** [1] - 6:9
**mind** [1] - 14:2
**minimum** [1] - 16:17
**minor** [2] - 36:24, 45:6
**minute** [2] - 24:19, 41:20
**missed** [3] - 24:23, 26:3, 42:21
**missing** [1] - 25:6
**MISSOURI** [3] - 1:1, 2:1, 52:1
**Missouri** [13] - 1:24, 2:17, 2:19, 2:21, 2:22, 4:10, 4:15, 4:19, 5:3, 17:7, 21:7, 50:3, 50:7
**misspellings** [1] -

**mistakes** [1] - 46:21
**Mm-hm** [2] - 9:21, 30:3
**mm-hm** [2] - 18:2, 46:24
**MO** [7] - 3:4, 3:7, 3:12, 51:3, 51:8, 52:12, 52:23
**money** [2] - 14:17, 14:18
**month** [3] - 8:24, 8:25, 26:1
**monthly** [1] - 31:15
**months** [3] - 13:6, 16:21, 32:25
**most** [10] - 10:6, 14:3, 15:21, 18:13, 18:19, 18:22, 19:21, 23:23, 25:16, 46:1
**motivational** [4] - 11:15, 11:17, 15:19
**moving** [1] - 44:9
**MR** [33] - 4:5, 19:4, 19:9, 19:17, 19:24, 20:4, 20:10, 20:12, 20:14, 20:21, 20:24, 23:25, 27:10, 27:19, 27:22, 27:25, 28:10, 28:13, 28:23, 29:1, 31:2, 37:8, 37:13, 37:18, 39:2, 39:8, 39:11, 40:25, 41:15, 46:13, 46:17, 46:25, 47:6
**MS** [39] - 19:2, 19:6, 19:12, 19:15, 19:18, 20:3, 20:5, 20:11, 20:17, 20:22, 21:2, 23:20, 24:1, 27:12, 27:20, 27:23, 28:5, 28:11, 28:20, 28:24, 30:25, 31:3, 34:6, 34:10, 34:12, 34:22, 35:1, 37:4, 37:9, 37:16, 38:22, 39:5, 40:18, 41:14, 41:18, 43:3, 43:7, 43:10, 46:12
**multiple** [1] - 32:16

## N

**name** [6] - 4:6, 4:7, 5:16, 22:9, 29:7, 50:18
**nature** [2] - 9:2, 13:3
**necessarily** [3] - 13:23, 14:5, 19:18

**need** [4] - 6:5, 12:10, 30:7, 37:20
**never** [1] - 28:18
**next** [1] - 15:10
**ninety** [1] - 13:10
**non** [1] - 29:24
**non-compliance** [1] - 29:24
**normal** [1] - 52:13
**notarized** [1] - 51:15
**NOTARY** [1] - 49:14
**note** [1] - 16:8
**notes** [1] - 29:20
**nothing** [1] - 6:20
**notice** [10] - 30:21, 33:17, 33:20, 36:23, 37:6, 38:12, 40:19, 45:7, 50:4
**notices** [1] - 39:16, 39:24
**notified** [1] - 16:17
**notify** [2] - 16:16, 29:21
**number** [8] - 11:7, 13:19, 13:20, 14:5, 14:10, 16:25, 24:21, 26:17
**Number** [1] - 39:12

## O

**o'clock** [2] - 2:16
**obtain** [1] - 23:4
**obtained** [1] - 42:5
**obviously** [1] - 43:10
**occurs** [1] - 8:23
**OF** [10] - 1:1, 1:4, 2:1, 2:4, 2:23, 3:6, 48:3, 52:1, 52:4, 52:16
**offender** [6] - 11:18, 13:11, 38:14, 38:16, 44:25, 46:6
**offenders** [4] - 18:13, 18:14, 18:16, 19:21
**OFFICE** [1] - 3:6
**office** [17] - 7:8, 8:3, 8:14, 8:25, 11:4, 17:13, 23:17, 23:18, 29:16, 30:8, 32:12, 36:7, 36:8, 36:14, 36:15, 40:5, 41:3
**Office** [2] - 3:11, 50:5
**officer** [17] - 5:5, 11:19, 21:15, 21:16, 22:24, 24:23, 25:8, 29:20, 31:12, 32:13, 32:25, 33:22, 34:19, 34:25, 39:23, 45:1, 45:10

4

officers [2] - 17:24, 32:17
offices [3] - 2:17, 30:1, 50:5
official [1] - 30:22
often [1] - 27:21
okayed [1] - 18:5
once [5] - 8:13, 8:23, 16:23, 26:1, 29:17
one [33] - 6:16, 11:7, 13:19, 13:20, 13:24, 14:6, 14:10, 14:24, 15:22, 16:25, 17:18, 18:1, 18:7, 18:19, 18:22, 19:24, 20:6, 20:7, 23:17, 23:21, 24:3, 25:16, 25:23, 27:13, 28:9, 33:9, 36:14, 37:21, 38:15, 41:19, 41:21, 45:17
one's [1] - 34:4
ones [3] - 20:7, 20:17, 23:21
operate [1] - 26:20
opportunity [1] - 11:21
opposite [1] - 36:8
options [2] - 15:2, 15:22
Order [2] - 9:12, 9:24
order [12] - 6:17, 7:24, 8:9, 9:24, 10:23, 11:2, 11:3, 12:6, 13:7, 13:11, 13:25, 24:11
ordered [2] - 28:1, 45:20
orders [4] - 31:5, 38:1, 39:3, 40:19
orientation [1] - 8:22
original [3] - 51:12, 51:16, 52:9
originally [2] - 35:23, 38:4
originating [15] - 30:23, 31:6, 34:7, 35:8, 35:10, 35:19, 35:21, 35:22, 36:6, 36:8, 36:15, 40:10, 40:23, 41:3
otherwise [3] - 6:14, 25:13, 28:18
ourself [1] - 8:16
ourselves [1] - 8:19
out-of-district [2] - 34:19, 34:25
outer [1] - 13:4
outlines [1] - 24:7
outpatient [5] - 11:8,

45:21
outside [1] - 6:23

## P

P.O [1] - 3:7
Page [6] - 48:7, 48:10, 48:13, 48:16, 48:19, 48:22
page [19] - 8:1, 9:7, 9:8, 21:12, 22:23, 23:11, 23:12, 26:17, 28:4, 37:2, 40:3, 41:2, 44:18, 44:19, 49:3, 51:13, 51:15
Pages [1] - 51:12
paid [1] - 52:13
parameters [1] - 13:17
parent [1] - 45:6
Parole [9] - 2:18, 3:11, 4:11, 5:4, 9:24, 10:2, 10:14, 10:18, 50:5
parole [9] - 5:7, 5:8, 8:21, 10:7, 10:18, 10:21, 21:16, 30:1, 30:12
paroled [1] - 35:24
parolee [3] - 9:17, 9:25, 10:16
part [4] - 6:19, 11:18, 19:7, 20:19
particular [8] - 9:6, 10:22, 22:4, 24:6, 27:12, 28:12, 31:13, 41:5
parties [2] - 23:9, 23:11
parts [1] - 44:9
party [2] - 21:13, 32:13
PATRICK [5] - 1:4, 2:4, 2:23, 48:3, 52:4
Patrick [1] - 51:9
Paul [4] - 4:7, 21:3, 34:6, 40:20
paul [1] - 51:6
PAUL [9] - 1:9, 2:13, 4:1, 4:7, 48:1, 49:1, 49:9, 50:8, 52:10
pending [1] - 2:21
PENNINGTON [1] - 3:6
Pennington [1] - 3:8
people [5] - 12:24, 14:14, 23:24, 26:3, 32:2
period [1] - 43:1
permission [1] - 45:13

22:24
personal [2] - 29:7, 42:18
personally [1] - 47:8
phone [2] - 26:2, 27:5
photograph [2] - 5:20
Pike [1] - 35:7
pipeline [1] - 36:20
place [1] - 50:12
placed [1] - 35:23
places [1] - 45:17
plan [3] - 11:19, 11:22, 16:9
play [1] - 36:5
point [3] - 11:13, 15:8, 46:5
pointed [1] - 43:24
policy [1] - 22:6
policy-wise [1] - 22:6
positive [2] - 26:8, 42:23
possible [2] - 44:5
PR00407 [4] - 1:4, 2:4, 51:9, 52:4
practice [3] - 26:21, 29:12, 44:2
prerogative [1] - 46:7
present [1] - 3:9
presentment [2] - 46:19, 47:1
pretty [1] - 19:23
primary [1] - 5:5
printed [2] - 18:9, 51:12
priority [1] - 14:6
privilege [1] - 26:21
PROBATE [3] - 1:1, 2:1, 52:1
probation [35] - 6:13, 6:17, 7:25, 8:3, 8:7, 8:20, 9:25, 10:4, 10:12, 10:24, 10:25, 11:19, 21:16, 22:21, 22:24, 24:23, 25:8, 28:3, 28:17, 29:24, 30:1, 30:11, 32:16, 33:22, 35:14, 35:23, 38:1, 38:10, 38:21, 39:4, 40:5, 45:1, 45:10, 46:9
Probation [10] - 2:18, 3:11, 4:10, 5:3, 9:12, 9:23, 10:2, 10:14, 10:17, 50:5
probationer [8] - 8:15, 9:17, 11:10, 15:4, 26:22, 39:13, 42:7, 44:13
probationer's [1] -

problem [3] - 19:4, 19:9, 41:17
procedure [3] - 8:14, 22:5, 24:17
process [2] - 16:3, 22:13
produced [2] - 2:13, 4:2
professional [2] - 12:10, 25:4
program [15] - 10:4, 11:9, 11:11, 12:5, 13:19, 13:21, 14:22, 16:24, 17:3, 25:14, 27:15, 32:25, 43:4, 45:21, 45:23
programs [5] - 24:24, 25:7, 25:19, 28:17, 29:5
progressive [2] - 15:9, 16:14
propounded [1] - 49:5
prosecuting [1] - 38:17
prosecutor [1] - 15:24
provide [1] - 41:19
provider [21] - 11:23, 17:12, 18:4, 18:19, 21:23, 22:23, 25:2, 25:5, 26:14, 26:22, 26:23, 27:3, 28:15, 40:5, 42:6, 42:13, 42:15, 42:20, 44:13, 46:1
providers [7] - 17:9, 17:15, 18:8, 26:13, 29:14, 44:2, 44:9
providing [2] - 28:15, 28:17
psychology [1] - 4:14
PUBLIC [1] - 49:14
public [2] - 6:14, 42:19
pull [2] - 45:13, 45:14
purpose [1] - 22:20
pursuant [3] - 5:12, 9:13, 50:4
put [1] - 34:1

## Q

questions [4] - 5:16, 46:14, 49:2, 49:5
quickly [1] - 44:5
quote [4] - 15:10, 27:1, 31:3, 33:25

## R

R1 [1] - 20:13
rather [1] - 11:19
re [1] - 14:22
Re [7] - 1:3, 2:3, 2:22, 48:3, 51:9, 52:3
re-referral [1] - 14:22
reaction [1] - 14:21
reaction's [1] - 15:2
read [11] - 33:9, 37:21, 42:25, 44:21, 48:7, 48:10, 48:13, 48:16, 48:19, 48:22, 49:1
reading [1] - 48:4
readjust [1] - 16:9
reality [3] - 25:11, 27:2, 44:2
really [5] - 19:10, 19:15, 45:19, 45:24, 46:14
Reason [6] - 48:8, 48:11, 48:14, 48:17, 48:20, 48:23
reason [1] - 13:20
reasonable [1] - 19:23
reasonably [1] - 20:25
reasons [1] - 14:13
recalcitrant [1] - 15:7
receive [3] - 26:13, 31:7, 36:11, 39:1
received [3] - 11:3, 31:16, 40:20
recently [1] - 19:16
recess [1] - 42:3
recognize [1] - 17:20
recommendation [1] - 15:16
record [3] - 7:16, 20:1, 47:5
records [2] - 6:16, 35:24
recovery [2] - 25:4, 43:15
Recovery [2] - 18:7, 21:9
reduced [1] - 50:14
refer [1] - 29:20
referal [1] - 17:3
referral [6] - 14:22, 21:9, 22:13, 23:1, 23:3, 24:2
referring [3] - 9:8, 11:7, 26:13
reflected [2] - 7:1, 9:18
regarding [1] - 20:2
region [4] - 20:9, 20:11, 22:16

registering [1] - 8:15
regular [2] - 25:15, 25:24
regularly [1] - 27:9
relapse [1] - 14:16
related [4] - 6:9, 6:16, 22:7, 42:8
relationship [1] - 28:8
relatively [1] - 19:22
release [17] - 7:24, 23:7, 23:14, 23:23, 24:3, 24:11, 27:17, 28:18, 28:21, 40:4, 40:7, 41:2, 41:6, 41:8, 41:13, 41:14, 42:5
released [1] - 5:7
releases [1] - 32:2
remember [2] - 5:17, 5:18
report [8] - 8:2, 8:13, 15:23, 16:7, 22:24, 29:21, 31:16, 49:4
Reported [1] - 1:22
Reporter [2] - 2:20, 50:2
REPORTER'S [1] - 52:8
REPORTING [3] - 1:23, 51:2, 52:22
reports [10] - 25:25, 27:6, 30:21, 30:22, 33:17, 33:21, 35:11, 36:13, 39:25, 40:18
requesting [1] - 15:11
require [1] - 22:22
required [7] - 12:5, 16:16, 22:11, 23:12, 24:13, 25:8, 36:17
requirement [1] - 26:14
requires [1] - 16:22
resemblance [1] - 5:22
resource [1] - 17:24
response [1] - 49:5
responsibilities [3] - 24:7, 24:22, 25:4
responsibility [2] - 25:2, 35:2
restrictions [1] - 9:2
results [1] - 42:14
retained [1] - 34:4
return [1] - 51:15
returned [1] - 50:16
reverse [2] - 35:15, 36:5
revert [1] - 41:4
review [8] - 12:13,

47:6, 47:7, 51:13, 51:14
revocation [4] - 45:7, 45:24, 45:25, 46:4
revoke [6] - 10:12, 27:17, 45:8, 45:12, 45:20
revoked [2] - 37:15, 46:7
ride [1] - 14:18
Ridge [1] - 20:23
riding [1] - 10:9
Road [3] - 2:18, 50:6, 51:7
roles [2] - 24:7, 36:5
room [2] - 17:10, 17:21
rule [2] - 44:6, 46:17
rules [2] - 24:10, 38:20
run [2] - 4:12, 4:23
rural [1] - 12:25

## S

Saint [1] - 1:24
sake [1] - 15:4
sanction [1] - 15:8
sanctions [2] - 14:25, 15:14
scale [1] - 19:23
scenario [1] - 36:9
SCHWARTZ [5] - 1:5, 2:5, 2:23, 48:3, 52:4
Schwartz [8] - 1:9, 2:14, 3:2, 3:10, 4:3, 5:16, 8:2, 51:9
Schwartz's [1] - 29:7
Science [1] - 4:14
second [6] - 9:7, 21:25, 23:11, 26:17, 40:3, 44:18
secrets [1] - 27:1
see [6] - 15:20, 17:11, 18:6, 22:19, 38:23, 47:1
seeing [2] - 29:4, 29:11
select [1] - 12:5
selected [1] - 16:23
self [2] - 17:3, 44:22
self-initiated [1] - 17:3
send [6] - 34:19, 35:1, 35:2, 37:1, 37:6, 37:12
sending [1] - 29:25
sense [9] - 10:10, 15:10, 24:17, 26:18,

33:2, 37:13
sent [8] - 24:15, 30:20, 30:23, 32:10, 33:19, 33:24, 34:1, 34:18
separate [1] - 23:15
separately [1] - 33:10
served [1] - 5:9
service [3] - 21:23, 40:5, 41:5
Services [1] - 21:9
services [4] - 23:4, 24:14, 28:15, 43:15
set [8] - 11:10, 13:10, 13:17, 15:9, 16:14, 17:2, 42:24, 43:2
setting [1] - 19:11
seven [1] - 16:12
several [2] - 32:18, 32:25
share [1] - 45:14
sheet [3] - 9:19, 51:13, 51:15
SHEET [1] - 48:2
Sheila [10] - 3:11, 6:6, 6:25, 7:1, 7:7, 22:15, 27:10, 33:4, 37:20, 46:11
shorthand [1] - 50:13
show [1] - 44:15
sign [16] - 21:14, 22:6, 23:12, 28:22, 32:2, 38:14, 38:15, 42:7, 43:3, 44:20, 45:7, 45:8, 45:11, 45:17, 45:24, 46:3
signature [6] - 33:25, 38:13, 44:24, 50:15, 51:12, 51:15
signatures [1] - 44:17
signed [6] - 26:14, 27:15, 45:23, 46:4, 51:15, 51:15
signs [2] - 44:13, 44:14
similar [3] - 22:17, 29:13, 41:7
simply [3] - 6:5, 39:23, 46:6
Sincerely [1] - 51:18
sit [3] - 8:21, 8:22, 16:6
sitting [1] - 7:1
six [2] - 2:16, 16:21
sixty [1] - 5:6
sliding [1] - 19:23
slightly [1] - 8:25
smarter [1] - 7:4
Solutions [1] - 25:20
someone [4] - 9:17,

sometimes [15] - 11:22, 12:16, 13:2, 16:8, 16:11, 18:18, 22:15, 25:25, 26:1, 26:6, 27:16, 36:23, 39:9, 39:23, 39:24
somewhere [1] - 26:15
soon [1] - 40:23
sorry [4] - 14:8, 18:25, 19:14, 36:7
sort [6] - 13:12, 24:24, 25:7, 33:23, 42:23
sought [1] - 24:14
Southeast [1] - 4:15
southeast [1] - 20:11
speaking [2] - 25:22, 25:23
special [6] - 6:17, 8:6, 9:7, 13:23, 16:22, 38:24
specific [13] - 6:3, 6:20, 8:2, 9:1, 11:1, 11:22, 16:24, 22:21, 23:15, 23:17, 23:18, 25:22, 39:3
specifically [3] - 6:9, 10:18, 38:11
specifics [1] - 9:15
specify [1] - 44:11
spectrum [1] - 15:1
speculate [2] - 14:2, 20:25
speed [1] - 7:4
spelling [1] - 46:21
St [20] - 3:4, 4:25, 18:13, 20:6, 20:7, 21:1, 22:10, 22:13, 31:1, 31:2, 35:6, 35:7, 35:15, 35:25, 36:1, 36:4, 51:3, 52:12, 52:23
stage [1] - 16:2
stall [1] - 13:6
standard [1] - 23:20
start [1] - 5:23
started [8] - 4:24, 4:25, 6:7, 29:25, 30:2, 30:4, 33:5, 39:2
State [7] - 2:19, 2:20, 2:22, 4:15, 17:7, 50:3, 50:6
state [2] - 4:6, 49:1
STATEMENT [1] - 52:16
status [2] - 34:1, 46:9
stays [1] - 38:15
stick [1] - 27:14

12:21
Street [5] - 1:24, 3:3, 51:2, 52:11, 52:23
Strike [1] - 36:7
stubs [2] - 31:19
stumble [1] - 45:9
submit [1] - 12:12
submitted [1] - 50:14
subpoena [2] - 5:9, 5:13
subpoenas [2] - 29:25, 30:8
Subscribed [1] - 49:11
subscribed [1] - 50:17
subscribing [1] - 48:4
substance [3] - 11:8, 27:14, 40:21
successfully [1] - 11:8
Suite [2] - 3:3, 52:11
summaries [1] - 16:20
summarize [1] - 22:19
summary [6] - 16:18, 16:21, 25:24, 27:6, 29:21, 30:21
supervise [1] - 5:5
supervising [6] - 21:15, 32:11, 32:12, 34:6, 36:14, 38:11
supervision [6] - 5:5, 5:8, 5:25, 9:5, 11:19, 31:16
supervisor [2] - 33:24
supposed [7] - 12:15, 26:23, 26:24, 26:25, 30:10, 38:11, 38:19
sworn [5] - 2:13, 4:2, 20:2, 49:11, 50:9
system [3] - 23:22, 38:25, 39:7

## T

task [1] - 12:19
ten [1] - 33:16
tends [2] - 11:16, 11:17
term [1] - 10:3
terms [6] - 6:13, 6:20, 8:6, 9:23, 11:2, 28:2
testifies [1] - 4:3
testimony [1] - 20:2
testing [1] - 42:22
THE [10] - 1:1, 2:1, 3:3, 41:16, 46:16, 46:24, 47:3, 47:7, 52:1, 52:17
themself [1] - 21:20

6

therefore [4] - 16:9
thereto [1] - 48:4
thirty [3] - 11:17, 16:12
thirty-seven [1] - 16:12
thousands [2] - 44:7, 44:8
threats [1] - 26:10
three [5] - 13:6, 21:13, 23:11, 26:18, 45:21
three-party [1] - 21:13
tie [1] - 27:25
timeframe [2] - 12:14, 12:17
today [1] - 5:12
together [1] - 27:25
top [2] - 32:20, 44:19
topics [1] - 6:8
total [2] - 26:18, 29:1
TOTAL [1] - 52:17
touched [1] - 15:19
touching [1] - 50:10
towards [1] - 26:10
transcript [6] - 20:2, 49:2, 51:12, 51:13, 51:14, 51:16
transfer [1] - 16:22
transferred [1] - 5:1
transportation [4] - 12:21, 14:15, 14:18, 18:17
transportation's [1] - 13:2
travel [1] - 9:1
Treatment [1] - 21:9
treatment [32] - 10:3, 11:22, 11:23, 12:1, 12:9, 12:10, 14:22, 15:20, 17:2, 17:5, 17:16, 20:19, 22:10, 22:22, 23:23, 25:4, 25:5, 25:19, 26:3, 27:7, 31:17, 32:24, 42:8, 42:13, 42:14, 43:4, 43:15, 44:7, 44:9, 46:1, 46:8
true [2] - 35:16, 49:4
truly [1] - 28:15
truth [1] - 50:9
Try [1] - 11:16
try [7] - 11:22, 11:24, 13:11, 15:19, 27:14, 28:7, 44:4
trying [4] - 12:4, 15:9, 24:1, 30:9
twenty [1] - 13:9
twice [1] - 28:7
two [12] - 21:12, 25:8, 28:4, 30:25, 41:2, 44:3, 44:6, 44:10, 44:19
two-day [1] - 44:6
type [5] - 7:20, 32:12, 39:16, 42:5, 46:19
typed [2] - 38:22, 38:25
types [2] - 30:10, 40:15
typewriting [1] - 50:14
typical [1] - 8:9
typically [2] - 23:21, 23:23

U

ultimately [1] - 35:24
under [5] - 10:4, 12:6, 25:3, 26:20, 28:2
understandable [1] - 29:12
unit [1] - 33:23
University [1] - 4:15
unless [1] - 10:6
unusual [1] - 5:23
unwilling [2] - 15:4, 15:6
up [20] - 7:5, 11:10, 15:10, 15:12, 15:23, 17:2, 18:12, 19:10, 25:20, 27:3, 30:10, 32:9, 34:15, 37:15, 37:17, 38:23, 38:25, 40:1, 41:20, 46:19
updates [1] - 27:7
updating [1] - 25:24
urinalysis [2] - 26:8, 42:14
uses [1] - 28:12
utilize [6] - 11:14, 18:14, 18:15, 20:6, 22:16, 27:13
utilized [1] - 51:13
utilizing [2] - 15:18, 45:2

V

vaguely [1] - 5:18
value [1] - 15:20
varies [3] - 11:12, 22:15, 22:16
various [1] - 30:1
verify [1] - 46:8
versus [1] - 20:2
via [4] - 23:4, 27:5, 34:19, 51:11

violate [1] - 11:1
violating [1] - 10:16
violation [15] - 9:23, 9:25, 10:1, 10:24, 11:4, 14:23, 15:23, 16:3, 16:7, 30:21, 33:17, 33:21, 36:13, 39:25
violations [2] - 34:16, 36:24

W

waiting [2] - 17:10, 17:21
waive [1] - 47:6
walk [3] - 7:11, 33:9, 37:20
wants [2] - 16:24, 37:11
warrant [3] - 14:24, 15:11, 15:12
Wednesday [2] - 8:24, 8:25
weeds [1] - 39:20
weeks [2] - 26:1, 45:22
WHEREOF [1] - 50:17
whole [1] - 50:9
widespread [1] - 16:3
willingness [1] - 14:15
wise [1] - 22:6
wish [1] - 45:15
WITNESS [7] - 41:16, 46:16, 46:24, 47:3, 47:7, 48:1, 50:17
witness [2] - 45:1, 45:5
witnessed [1] - 38:13
words [3] - 11:17, 11:25, 46:19
worker [1] - 45:2
works [5] - 22:20, 25:11, 27:2, 27:11, 28:5
wrap [1] - 40:1
write [1] - 16:7
writes [1] - 29:21

Y

Yaeger [3] - 2:18, 50:6, 51:7
year [2] - 4:16, 28:7
yourself [1] - 44:22

7